CARLOS RAMOS, Plaintiff-Appellee, v. PRAHLAD PYATI, Defendant-Appellant.

First District (5th Division)   No. 87—1709

Opinion filed January 27, 1989.

216

Hinshaw, Culbertson, Moelmann, Hoban & Fuller, of Chicago (D. Kendall Griffith, Douglas H. Momeyer, and Nancy G. Lischer, of counsel), for appellant.

Robert W. Karr and Marion A. Morawicz, both of Robert W. Karr & Associates, Ltd., of Chicago (Sidney Z. Karasik, of counsel), for appellee.

PRESIDING JUSTICE MURRAY delivered the opinion of the court:

Defendant, Prahlad Pyati, M.D., appeals from several rulings of the trial court in a medical malpractice suit filed by plaintiff, Carlos Ramos, in which he alleged that defendant performed surgery on his hand outside the scope of the surgery to which he had consented. Specifically, defendant contends that: (1) the trial court erred in denying his motion for a directed verdict because plaintiff failed to prove a

*prima facie* case of medical malpractice; (2) the court erred in directing a verdict in favor of plaintiff based on its conclusion that plaintiff did not consent to the use of the ring finger tendon as a donor tendon; and (3) the court abused its discretion in limiting his expert's opinion testimony. For the reasons set forth below, we affirm.

The record discloses that in November 1977 plaintiff injured his thumb while at work. He was referred to defendant, after seeing three other doctors, in February 1978. Defendant subsequently diagnosed plaintiff's injury as a ruptured thumb tendon and, after obtaining plaintiff's consent to surgically repair the tendon, he operated on the thumb. During the course of the operation, defendant was unable to join the two ends of the ruptured tendon because of scar tissue which had formed and caused the ends to retract. He then examined plaintiff's palmaris longus (wrist) tendon and found it unsuitable as a donor to bridge the gap between the ends of the ruptured tendon. Defendant proceeded to examine "the already exposed area for another available, suitable tendon" and chose the digitorum sublimis superficialis (ring finger) tendon. After the surgery, plaintiff continued to see defendant for approximately one month.

In July 1979, plaintiff filed an action against defendant for medical malpractice, alleging that his hand was "rendered unusable for his customary mode of employment"[1] and that defendant had breached his duty by not: (1) advising him of the serious nature of the proposed operations; (2) exercising a proper degree of care in the performance of the operation; and (3) discontinuing the surgery when he knew or should have known that the "required surgery" would probably cause a greater disability than the already injured condition of his thumb.

At trial, plaintiff testified that although he signed a written consent form authorizing surgery on his thumb, he did not consent to a graft of his ring finger tendon or any other tendon. Plaintiff further stated that defendant only told him that he would have "two small operations" in his wrist to repair his thumb injury; that after the surgery and a cast that had been placed on his hand was removed, he experienced stiffness in his hand and discovered five scars from incisions made by defendant; and that as a result of the surgery he cannot bend his ring finger independently of his other fingers, he has trouble picking up nuts and bolts and handling his tools which he uses

---

[1]Based on the fact that plaintiff's counsel advised the court at a pretrial conference that plaintiff was not seeking recovery of loss of earnings, counsel for both parties agreed that the words "unusable for his regular job" be changed to "less usable" for "everything" (all activities involving the use of his hand).

in his occupation as a mechanic, and he does not have the same grip strength that he had prior to the surgery.

Defendant testified that due to the passage of time and the number of patients he had seen since treating plaintiff (nine years), he could not remember the specifics of the conversations he had with plaintiff concerning his surgery. Based on his custom and practice, however, he stated that he would have explained the surgical procedure to plaintiff and the consequences of treatment. Specifically, defendant would have explained to plaintiff that he would attempt to rejoin the ends of the ruptured tendon or, if he could not do so, he would graft his wrist tendon to do so. He also would have advised plaintiff that if the wrist tendon was unsuitable, he would use a tendon from another source. Defendant further stated, however, that it was likely since he had not planned to use the ring finger tendon, he would not have told plaintiff that he was planning to use it. Additionally, defendant testified that he did not consider using plaintiff's calf tendon as a donor tendon because its use might require getting another consent from plaintiff.

With respect to the preferred choice of donor tendons, Dr. Donald Miller, plaintiff's expert witness, testified that the ring finger tendon is the last choice of four other tendons based upon medical texts relied on at trial. Dr. Miller described the order of use of the preferred donor tendons as (1) the wrist tendon, (2) the calf tendon, (3) toe extensor tendons, (4) small or index finger tendons, and (5) the ring finger tendon. He further explained that the ring finger tendon is the last choice because it, unlike the other tendons that are "fine" and nonfunctional, does not have as much elasticity as the nonfunctional tendons to provide the greatest amount of flexion, and it has a function—"serves a purpose." Additionally, Dr. Miller stated that removal of the ring finger tendon results in a little weakening of that finger and loss of "some of the elasticity and strength of the hand." He also stated that he had used the ring finger tendon in two instances—accident cases—only because the other preferred tendons were unavailable. It was Dr. Miller's opinion that had defendant used a tendon other than the ring finger tendon, plaintiff's flexion in his thumb would be greater than it is and his ring finger, unimpaired, would be normal, and plaintiff would have greater strength in his hand. Accordingly, it was Dr. Miller's opinion that defendant therefore deviated from the standard of care. Lastly, Dr. Miller stated, in response to a question on direct examination whether failure to tell plaintiff prior to surgery about the possible use of the ring finger tendon was a deviation from the standard of disclosure, "that in [the] form of consent

telling the patient exactly what is to be done is very important, specifically spell it out and define it so that there was a breach of care."

The testimony of Dr. John Bell, defendant's expert witness, was limited to his opinion given in a deposition taken by plaintiff based on defendant's failure to answer in writing interrogatories submitted to him pursuant to Supreme Court Rule 220 (107 Ill. 2d R. 220), *i.e.,* that the operative procedure was in conformity with acceptable medical practice.

During the trial, defendant moved for a directed verdict at the close of plaintiff's case on the grounds that plaintiff failed to present evidence that defendant's alleged failure to obtain an informed consent from plaintiff proximately caused his injury, there was no evidence showing that the operation had caused loss of flexion or other injury, plaintiff's claim that his hand was "unusable" for his customary employment was disproved since he had testified that he had continued working at his former job after the surgery, and plaintiff had failed to prove a *prima facie* case for medical malpractice. The court denied defendant's motion. At the close of all the evidence, plaintiff moved for a directed verdict on the issues of consent, absence of consent, and proximate cause "between the performance of the surgery and the resultant injury." The court granted the motion as to the absence of consent for the use of the ring finger tendon as a donor, but denied it as to proximate cause and did not direct a verdict as to the thumb surgery. Prior to closing statements, the court instructed the jury on the directed verdict as follows:

> "The Court has decided, as a matter of law in this case, that the defendant, Dr. Pyati, is liable to the plaintiff, Mr. Ramos, for failure to get the consent of Mr. Ramos to the surgery on his ring finger.
>
> The amount of damages to be awarded, if any, to the plaintiff for this liability will be decided by the jury. All other issues of liability and damages are to be decided by the jury."

The jury subsequently returned a verdict on the issue of liability as to the use of plaintiff's ring finger tendon, as instructed by the court, and assessed damages in the amount of $94,000. No verdict was returned as to plaintiff's thumb. This appeal followed.

■ Defendant first argues that the trial court erred in denying his motion for a directed verdict at the close of plaintiff's case because he failed to prove a *prima facie* case of medical malpractice. The elements which must be proved by a plaintiff to establish medical malpractice are: (1) the standard of care by which the physician's treatment is measured; (2) a deviation from that standard; and (3)

that the deviation proximately caused the plaintiff's injury. (*Borowski v. Von Solbrig* (1975), 60 Ill. 2d 418, 328 N.E.2d 301; *Newell v. Corres* (1984), 125 Ill. App. 3d 1087, 466 N.E.2d 1085.) Proof of these elements is generally based upon expert testimony, unless the conduct is so grossly negligent or the treatment so common that a layman may understand the conduct without the necessity of expert testimony. (*Walski v. Tiesenga* (1978), 72 Ill. 2d 249, 381 N.E.2d 279.) Failure to prove any one of these elements requires a directed verdict in a defendant's favor. *Walski*, 72 Ill. 2d 249, 381 N.E.2d 279.

Here, defendant contends that plaintiff failed to prove by expert testimony the standard of care to which defendant was held, asserting that defendant's choice of tendons was merely a matter of preference and therefore an *alternative method of treatment* which is not a basis for establishing negligence. (See *Walski v. Tiesenga* (1978), 72 Ill. 2d 249, 381 N.E.2d 279.) Since plaintiff's expert testified that any of the other tendons are useful to the performance of plaintiff's type of operation, defendant asserts that his use of the right finger tendon was within acceptable medical practice.

We disagree with defendant's reasoning. At trial the parties were required to establish the standard of care based on their personal expertise and two medical texts. We note even though the order of preferred tendons varies in the texts, use of the ring finger tendon is the last choice in both texts. We conclude, as apparently did the jury, that the reason for the ring finger tendon's position in last place is because, as Dr. Miller explained, it lacks the elasticity of the other tendons and is a functional, rather than a nonfunctional, tendon and removal of it results in some physical impairment. Plaintiff's expert therefore established a sufficient standard of care; the ring finger tendon is to be used only if no other tendons are available.

Defendant also contends that plaintiff failed to prove damages. Defendant points out that plaintiff claimed that his hand was *unusable* for his customary mode of employment, yet plaintiff admitted that after the operation his hand *was usable* for his job since he was able to continue his work duties as a loader and could still lift packages weighing over 100 pounds. Defendant apparently forgot the fact, however, that in a pretrial conference his counsel, along with plaintiff's counsel, agreed to change the language of plaintiff's claim that his hand was "unusable for his customary mode of employment" to "less usable" for "everything" involving the use of his hand. We also observe that plaintiff's job as a loader is different from his work as a mechanic in which he, subsequent to the operation, has experienced difficulty in using his tools and picking up small objects.

Similarly, we reject defendant's argument that plaintiff's claim for scarring is spurious because plaintiff knew there would be incisions when he consented to the operation. We cannot determine what weight the jury gave to this issue, but the fact remains that there were five incisions, rather than the two plaintiff consented to when the operation was explained to him. Defendant further argues that there was no evidence that plaintiff's thumb was injured or worsened as a result of the operation. We find it unnecessary to address this argument because the jury did not enter a verdict on plaintiff's thumb injury claim and, therefore, no issue exists on this point. As regards defendant's assertion that plaintiff failed to show that his ring finger was damaged because the use of the ring finger tendon *normally* results in a little weakening of the end joint of that finger, some loss of elasticity, and loss of strength in the hand, we first observe that plaintiff did not consent to the use of his ring finger tendon, as discussed below, and, secondly, this *normal* result would not have occurred had defendant used a nonfunctional tendon. Plaintiff therefore sufficiently proved damages.

Defendant further contends that plaintiff failed to prove a lack of informed consent and, *arguendo*, if he did not consent to the grafting of his ring finger tendon, he nonetheless failed to prove that breach of the standard of disclosure proximately caused any damage. In support thereof, defendant asserts: (1) that plaintiff's expert witness, Dr. Miller, did not establish the medical standard of disclosure but merely expressed his opinion on how to avoid legal liability in a written consent form; (2) that he owed no duty to inform plaintiff of the "remote" risk that he might have to use another tendon if the wrist tendon was unsuitable; (3) that once plaintiff consented to the surgical procedure, his consent extended to *all* necessary actions taken during the course of the operation, expressly and impliedly; and (4) there was no evidence, expert or otherwise, as to whether a prudent person in plaintiff's position would have declined the procedure followed by defendant.

As correctly stated by defendant, a plaintiff, who claims lack of informed consent as a basis for recovery, must prove the standard of disclosure by expert testimony, *i.e.*, "that the reasonable medical practitioner of the same school, in the same or similar circumstances, would have told the patient of such risks, or that the disclosures as made *** did not meet the standard of what a reasonable medical practitioner would have disclosed under the same or similar circumstances." (*Green v. Hussey* (1970), 127 Ill. App. 2d 174, 184, 262 N.E.2d 156.) It is also well settled that a physician only owes a duty

to inform a patient for *foreseeable risks*, results and alternatives of a given procedure that a reasonable physician would have disclosed in the same or similar circumstances. *Guebard v. Jabaay* (1983), 117 Ill. App. 3d 1, 452 N.E.2d 751.

■ In the instant case, notwithstanding the fact that plaintiff claimed defendant never informed him that a graft of another tendon might have to be performed, and defendant testified that he had not foreseen use of the ring finger tendon for the graft and therefore would not have told plaintiff of that possibility, the following questions and answers were offered by plaintiff on the standard of disclosure to obtain informed consent:

> "Q. Now, doctor, based upon a reasonable degree of medical and surgical certainty, did the defendant in failing to advise Mr. Ramos of the fact that he preferred to use the sublimis tendon or the ring finger tendon as a second choice to the palmaris longus tendon [wrist tendon], was it a deviation from the standard of care not to tell that to Mr. Ramos before surgery?
>
> A. Yes, I think that in [the] form of consent telling the patient exactly what is to be done is very important, specifically spell it out and define it so that there was a breach of care.
>
> Q. Now doctor, what are the reasons for telling a patient what is going to occur or what is probably going to occur during surgery before you begin the procedure?
>
> A. I think the important thing is to inform the patient what is going to be done so that if there is a complication or problem at least you're covered when you tell the patient specifically what you're going to do. That's the important part."

Defendant contends that Dr. Miller's testimony is merely an expression of how to avoid liability, rather than a standard of disclosure. While it is true that Dr. Miller's statement includes a *reason* for informing a patient "exactly what is to be done" (to avoid liability), the statement also clearly expresses his expert opinion that a failure to inform a patient about the possible use of his ring finger tendon as a second choice to his wrist tendon would be a deviation from the standard of disclosure.

We are also unpersuaded by defendant that the unsuitability of the wrist tendon and use of another tendon was a "remote" risk. (See *Miceikis v. Field* (1976), 37 Ill. App. 3d 763, 347 N.E.2d 320.) As disclosed by the record, although the wrist tendon is suitable in 80% to 90% of cases, we find it difficult to believe that defendant would not take the additional step to consider the possibility of the unsuitability of the wrist tendon and use of the ring finger tendon and relate that

information to plaintiff, assuming he had told plaintiff of the possibility of a graft of another tendon. After all, defendant testified that he would not know if the wrist tendon was suitable until he opened up plaintiff's wrist. With that fact in mind, the possibility that it would be unsuitable, although rare, should also have reasonably occurred to defendant as a foreseeable risk, rather than a "remote" one.

■ We also reject defendant's argument that plaintiff's consent extended to the graft of his ring finger tendon based on the written consent form signed by plaintiff. Defendant relies on *Pratt v. Davis* (1906), 224 Ill. 300, 309, 79 N.E. 562, in which our supreme court stated:

> "Where the patient desires or consents that an operation be performed and *unexpected conditions* develop or are discovered in the course of the operation, it is the duty of the surgeon, in dealing with these conditions, to act on his own discretion, making the highest use of his skill and ability to meet the exigencies which confront him, and in the nature of things he must frequently do this without consultation or conference with any one, except, perhaps, other members of his profession who are assisting him." (Emphasis added.)

In the instant case, plaintiff signed a written consent form which provides, in pertinent part, as follows:

> "1. I authorize the performance upon myself of the following operation Repair [*sic*] of tendon right thumb to be performed under the direction of Dr. Pyati.
>
> 2. I further consent to the performance of surgical operations, medical treatment and procedures in addition to, or different from, those now contemplated, whether or not arising from presently *unforeseen conditions*, which the above named Doctor or his associates or assistants may consider necessary or advisable in the course of the operation or other medical services."

We first note that both *Pratt* and the consent form refer to *unexpected* conditions or *unforeseen* conditions, respectively. As we have already determined, the possibility that the wrist tendon might be unsuitable, requiring the use of another tendon, was not a "remote" risk and we do not believe that it thus can be characterized as an unexpected or unforeseen condition as contemplated by the language of *Pratt* or the consent form. Secondly, we reject defendant's assertion that by signing the consent form, "plaintiff acknowledged that an explanation of the nature and purpose of the operation, alternatives and risks had been provided to him" and the "written consent authorized

all actions taken during the operation." Again, the consent form refers to unforeseen conditions, and use of another tendon, other than the wrist tendon, was not an unforeseen condition. Additionally, plaintiff, by signing the form, only consented to repair of his thumb and the surgical procedure explained to him by defendant, two operations/incisions in the wrist. Thus, even if, *arguendo*, defendant had told plaintiff about the possibility of grafting his wrist tendon to repair his thumb, it cannot be said that plaintiff consented to the use of his ring finger tendon (requiring three additional incisions), especially in light of the fact that defendant conceded he had not anticipated using plaintiff's ring finger tendon and therefore would not have told plaintiff of the possibility of its use were he to find plaintiff's wrist tendon unsuitable. Finally, we note that at trial defendant also stated that one of the reasons he did not consider using the calf tendon (preferred over the ring finger tendon) after finding the wrist tendon unsuitable was because to do so "might" require a second consent! We agree with the trial court that if a second consent "might" be required to use the *nonfunctional* calf tendon, it makes no sense that a second consent would not be required to use the *functional* ring finger tendon.

■ Defendant's last argument on this issue is *even if* the operation exceeded the scope of the consent given by plaintiff, plaintiff failed to prove his resulting condition was proximately caused by the absence of informed consent. It is well settled that "causation in informed consent cases is determined by an objective standard, what a prudent person in plaintiff's position would have decided if adequately informed. *** If disclosure would not have changed the decision of a reasonable person in the position of the patient, there is no causal connection between nondisclosure and his post-operative condition; if, however, disclosure would have caused a reasonable person in the position of the patient to refuse the surgery or therapy, a causal connection is shown." *Guebard v. Jabaay* (1983), 117 Ill. App. 3d 1, 10, 452 N.E.2d 751.

■ Here, defendant points out that plaintiff never testified that had the risks of using his ring finger tendon been disclosed, he would not have had the medical procedure. However, we observe that plaintiff's expert *did testify* that the use of another tendon would have been preferred over the ring finger tendon because of that tendon's lack of elasticity, which would result in less flexion of the thumb and impairment to the ring finger itself. Based on this testimony, we cannot say disclosure would not have changed the decision of a reasonable person to consent to the use of the ring finger tendon, *i.e.*, we

find it incomprehensible to believe that a prudent person would consent to further impairment of an already impaired hand for which he is seeking treatment.

In light of the foregoing, we hold that plaintiff established a *prima facie* case as to defendant's negligence in performing the operation and, accordingly, the trial court properly denied defendant's motion for a directed verdict at the close of plaintiff's case.

Defendant next argues that the trial court erred in directing a verdict in favor of plaintiff based on its conclusion that there was no consent to the use of the ring finger tendon as a donor. Specifically, defendant contends that the issue of informed consent was a question of fact for the jury and the trial court preempted its role and, alternatively, if, as the trial court found there was a total lack of consent, then plaintiff was barred from any recovery since his sole cause of action would have been for battery, which he did not plead.

While defendant is correct that generally when a question involves a claim based on the lack of informed consent it is a factual determination to be made by the jury (see *Ziegert v. South Chicago Community Hospital* (1981), 99 Ill. App. 3d 83, 425 N.E.2d 450), as well as where a written consent form has been signed and it is effective consent to treatment (see *Hansbrough v. Kosyak* (1986), 141 Ill. App. 3d 538, 490 N.E.2d 181), we find under the circumstances here, as did the trial court, that clearly there was no consent given to use of the ring finger tendon, as discussed above, and therefore there was no factual determination for the jury to make. Specifically, defendant admitted he would not have told plaintiff about the possibility of using his ring finger tendon as a donor tendon if he found the wrist tendon unsuitable because he did not anticipate the unsuitability of the wrist tendon. Therefore, plaintiff clearly could not have given defendant his consent to use of his ring finger tendon.

We also find that the court's ruling that there was a total lack of consent does not affect the negligence theory of plaintiff's action to transform it into an action based on battery, which plaintiff did not plead and which would bar him from recovery. While it is true that if a party has not consented to a medical procedure, then a subsequent action is for medical battery (see *Guebard v. Jabaay* (1983), 117 Ill. App. 3d 1, 452 N.E.2d 751), plaintiff's action, based on lack of informed consent, is viable to the extent that defendant failed to inform him that in repairing his thumb he would use the ring finger tendon if the wrist tendon was unsuitable. In other words, the lack of informed consent pertains to the operation on plaintiff's thumb and the subsequent use of the graft in repairing it, not solely to the use of

plaintiff's ring finger tendon as a donor tendon, and defendant's deviation from the standard of care applicable to surgeons. The fact that plaintiff could have filed an action premised on a theory of battery, because of the total lack of consent to use his ring finger tendon, is merely an alternative theory plaintiff could have pursued—not his only theory. Accordingly, we find that the trial court properly entered a directed verdict in plaintiff's favor.

Defendant's final argument is that the trial court abused its discretion in limiting his expert's testimony, *i.e.*, he was barred from testifying to the extent or cause of the injury, or anything other than his opinion that defendant's conduct was within the standard of good medical practice. The record discloses that plaintiff submitted Rule 220 interrogatories (see 107 Ill. 2d R. 220) to defendant on January 21, 1986, discovery was cut off on October 30, 1986, and defendant never answered the interrogatories. On January 5, 1987, during a pretrial conference, defense counsel asked leave to file an answer to plaintiff's Rule 220 interrogatories. The court denied his request and, as a sanction for the failure to timely answer, defendant's expert, Dr. Bell, was limited to testifying to the single opinion expressed in an earlier deposition taken by plaintiff's counsel.

At trial, Dr. Bell attempted to expand upon his single opinion contained in his deposition and the court admonished defense counsel that Dr. Bell was limited to testifying to that opinion. Subsequently, on an examination outside the jury's presence, as an offer of proof, Dr. Bell gave the following opinions: that if the surgeon determined a wrist tendon was too weak, it would be appropriate to use the ring finger tendon as a donor; because the surgeon can view the ring finger tendon during exploration of the thumb tendon, it is appropriate for him to evaluate the ring finger tendon and use it as a donor for a graft; where the wrist tendon is found to be unsuitable as a donor tendon, the calf tendon is also usually unsuitable and, as a result, a surgeon will not attempt to explore the possibility of using the calf tendon but will, instead, use another tendon; that if defendant had advised plaintiff that he needed surgical repair of his thumb tendon and that his delay in seeking treatment might have resulted in the formation of scar tissue, which would require the use of a donor tendon from another part of the body other than the wrist as expected, this would conform with the standard of care as to informed consent; in his opinion a reasonable person in plaintiff's position, after being apprised of the risks, benefits and possible complications, would have consented to the procedure; that plaintiff's condition has improved as a result of the surgery because he has additional flexion in his thumb;

and that plaintiff, by exercise, can develop increased flexion of his thumb. Dr. Bell also testified that although he had performed approximately 500 similar operations, he has never used the ring finger tendon as a donor tendon.

Supreme Court Rule 220 (107 Ill. 2d R. 220) requires that an expert, to be called to testify at trial, answer in writing interrogatories which state the subject matter on which the expert is to testify, his conclusions and opinions and the bases therefor, and his qualifications. Pursuant to the rule, he must also reasonably supplement his answer to interrogatories as additional information becomes known to him. In the instant case, it is undisputed that defendant did not timely answer the Rule 220 interrogatories. Defendant also attempted to "supplement" the opinion testimony expressed in his deposition through a letter to plaintiff one month prior to trial. In the old Blackstonian concept of confession and avoidance, the defense now seeks to avoid their failure to answer plaintiff's interrogatories by contending that plaintiff never took action to compel them to answer. The defense also explained to the court that there had been substantial compliance with discovery because the expert had been disclosed, his deposition taken, and his opinion "supplemented." Defendant also relies on *Acosta v. Chicago Transit Authority* (1976), 39 Ill. App. 3d 80, 349 N.E.2d 613, in support of his contention that the trial court abused its discretion in limiting his expert's testimony.

We first observe that *Acosta* is inapplicable. There, this court upheld the exercise of the trial court's discretion in permitting a bus driver to testify whose name had not been given in response to two interrogatories seeking the names of persons having knowledge of relevant facts concerning the plaintiff's accident; Rule 220, pertaining to expert witnesses, was not at issue.

We further observe that a trial court has broad discretion in imposing sanctions for discovery violations and the exercise of that discretion will not be disturbed absent a clear abuse. (*Brzezinski v. Gajda* (1972), 5 Ill. App. 3d 977, 284 N.E.2d 383.) The committee comments to subsection (c) of Rule 220 state that it:

> "[I]mposes on the party retaining an expert the obligation of responding to interrogatories ***. *** Courts should not view favorably the late disclosure of 'new' opinions following the mandatory cutoff deadlines provided in paragraph (b)." (107 Ill. 2d R. 220(c), Committee Comments, at 355-56.)

In the instant case, we note that defendant's contention that plaintiff was not diligent in seeking his compliance to answer the Rule 220 interrogatories is without merit; Rule 220 requires voluntary compli-

ance. Rule 220 also provides for disqualification of a party's expert for failure to comply with discovery. Here, the trial court, in its discretion, allowed defendant's expert to testify in accordance with his opinion expressed in his deposition. Under the circumstances, we believe that the trial court's ruling was well within the range of its broad discretion.

■■ Lastly, we observe that defendant, in any event, is estopped from claiming that the trial court abused its discretion in limiting his expert's testimony based on the following pretrial discussion at the time the court reviewed its file:

"THE COURT: Item 4 is the Defendant's Answers to the Plaintiff's Rule 220 Interrogatories filed January 21, 1986.

[DEFENSE COUNSEL]: Judge, essentially the deposition of our expert reflects that the opinions, except for one particular opinion where I advised counsel he did not ask the question, our expert was making his assumption that Dr. Pyati's reference to—

THE COURT: Wait a minute. Wait a minute. A year ago, you got 220 Interrogatories. Where is the answer?

That was due in 28 days at that time. It was due in February of 1986. This is January of 1987.

\* \* \*

Written reports, notes, his conclusions and opinions and his subject matter, his documents, where is it?

[DEFENSE COUNSEL]: For the purpose of the 220 Interrogatories, we produced our expert. Dr. John Bell.

THE COURT: I just want to know why the interrogatories were not answered, as the rule calls for, or if you have the answers and they didn't get into the court rule, fine, show me the stamped copy.

But this idea that somehow we can, at the time of trial, when we are about to pick a jury, answer the 220 Interrogatories or do it in some other fashion, I don't buy that. I don't buy it.

Why weren't these answered, or if they have been answered, please tell me.

\* \* \*

[DEFENSE COUNSEL]: In correspondence, I believe I identified our expert, Dr. John Bell.

THE COURT: They were to be answered under oath. That's the rule. I didn't make it. The Supreme Court did it.

Why wasn't this complied with, or was it?

[DEFENSE COUNSEL]: I do not believe it was complied with, your Honor, fully.

Judge, may we ask leave to file tomorrow morning Answers to Interrogatories that would be due.

*There will be no surprises from what the doctor has testified to* and what I told [plaintiff's counsel] approximately one month ago.

* * *

If I may, after my own review of the file, I did call [plaintiff's counsel] and advised him approximately a month or so ago when we were first before the court that we had a situation where questions were asked of our expert regarding his interpretation of what the 'small' meant, and this is in reference to a tendon, and he indicated that he interpreted it as meaning short.

We advised [plaintiff's counsel] in that conversation that the interpretation given by the doctor in his deposition was that it was small in diameter and his opinions remain the same.

* * *

Then the interrogatories are not necessary. *Counsel has been provided with all of the information.*

THE COURT: The 220 says first and the only time in all of our laws and rules, if you have the information, you must forward it without being asked for it.

[DEFENSE COUNSEL]: Yes, your Honor, and I have done that.

THE COURT: All right.

[DEFENSE COUNSEL]: Does that obviate the need for answering the 220 Interrogatories?

THE COURT: Yes, if you have supplied everything called for there.

[DEFENSE COUNSEL]: *Yes, I have supplied it.*

THE COURT: Except when he sends it to you under oath, then it's supposed to be filed under oath.

If you have everything that you need, let's not have any unnecessary paperwork.

[PLAINTIFF'S COUNSEL]: I have no objection to them calling Dr. Bell. I think they're entitled to.

THE COURT: You can bring him in. It's not a problem.

We can skip the 220 answer. The plaintiff is not answering supplementals." (Emphasis added.)

Notwithstanding the fact that the trial court clearly would not allow

defense counsel to file defendant's answer to the Rule 220 interrogatories submitted to him a year earlier, during the above colloquy defense counsel indicated to the court that defendant's expert opinion *would not be different* from the one expressed in his deposition *and that all information had been supplied to plaintiff.* Where a party induces or invites a court to rely on incorrect information, that party cannot later be heard to complain of an error relative thereto. (*In re Estate of Bania* (1984), 130 Ill. App. 3d 36, 473 N.E.2d 489.) At the least, therefore, the trial court correctly stated an answer to the Rule 220 interrogatories was unnecessary since defendant had supplied plaintiff with "all information." We further observe that the "supplemental" opinion of defendant's expert, as expressed in a letter to plaintiff one month prior to trial, regarding the alleged fact that when defendant's expert defined the wrist tendon as small/short he meant "small in diameter," was properly rejected not only because of its untimeliness but also because it attempted to change the expert's opinion as expressed in his earlier deposition. We further observe that the expert's opinions expressed in the offer of proof were *in addition* to the single opinion expressed in his deposition and, therefore, properly refused.

In light of the foregoing, we affirm the trial court in all respects.

Affirmed.

LORENZ and PINCHAM, JJ., concur.