**Christine STEINHAGEN, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. No. 89–CV–72453–DT.**

United States District Court, E.D. Michigan, S.D.

June 28, 1991.

Richard J. Dimanin, Detroit, Mich., for plaintiff.

Mary S. Rigdon, Asst. U.S. Atty., Detroit, Mich., for defendant.

## MEMORANDUM OPINION AND ORDER

ANNA DIGGS TAYLOR, District Judge.

Plaintiff has filed this suit against the United States pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2671 *et seq.* (FTCA), alleging negligence of medical personnel at Great Lakes Naval Hospital in Great Lakes, Illinois during the course of her obstetrical care and the delivery of her child on June 26, 1986.

A bench trial was conducted from February 19, 1991 through February 22, 1991, and this memorandum constitutes the findings of fact and conclusions of law of the Court. For the reasons outlined below, the Court grants judgment for Plaintiff and awards her damages in the amount of three hundred thousand dollars.

Plaintiff Christine Steinhagen was admitted to Great Lakes Naval Hospital (Great Lakes) through the emergency room on February 21, 1986, pregnant with her third child. She arrived at the hospital by ambulance with her husband, Bruce Steinhagen, who had called the ambulance because Plaintiff suffered a sudden onset of vaginal bleeding while at home.

An ultrasound examination revealed that Plaintiff had a complete placenta previa, a condition in which the placenta completely covers the cervical os, or opening. The greatest risk presented by this condition is that of hemorrhage, and that risk increases throughout the progress of the pregnancy. Every witness from Great Lakes testified that severe bleeding was always the concern throughout the management of a pregnancy whenever a placenta previa was present.

Complete bed rest was prescribed to minimize the risk. Plaintiff opted to remain in the hospital for the remainder of her pregnancy, as she had two small children at home and complete bed rest there would have been impossible. She was also worried that bleeding would reoccur and that she would bleed to death at home. She was, in fact, an extremely concerned patient, almost preoccupied with the likelihood of hemorrhage, partly because of her prior experience, which is discussed below.

The physician in charge of Plaintiff's care at Great Lakes was Dr. William Hollander, who had completed his residency as an obstetrician-gynecologist at Cook County General Hospital in Chicago, Illinois. Dr. Hollander was not board certified by the American College of Obstetrics and Gynecology at any time relevant to this lawsuit. He had passed the written examination of the College, but had not yet taken the oral examination and was fulfilling the practical experience prerequisite. Two board certified obstetrician-gynecologists, Dr. Gian and Dr. Meyers, were on staff at Great Lakes in his Department, however.

While at Great Lakes, Plaintiff was visited several times a day by her husband, a Navy corpsman who worked on the same floor as the maternity ward, and who was able to bring the couple's two daughters to visit their mother each day, as well.

On May 15, 1986, Dr. Hollander transferred Plaintiff to Lutheran General Hospital in Park Ridge, Illinois because of his concern that she might deliver a viable but extremely premature infant and Lutheran General, unlike Great Lakes, was equipped to care for infants so premature that their lungs were undeveloped. However, Bruce Steinhagen and the children were not able to visit Plaintiff as often because Lutheran General was further away from their home. Plaintiff and her family looked forward anxiously to her return to the pleasant and familiar surroundings of the Great Lakes Maternity Ward.

Doctors at Lutheran General began administering Terbutaline, a drug which prevents the uterus from contracting, to avoid a premature delivery. The drug was administered orally.

Plaintiff remained at Lutheran General for approximately twelve weeks. Amniocentesis was performed on May 21 and June 12, 1986 and it was determined that the fetus had mature lungs and could be safely delivered at Great Lakes. Plaintiff was accordingly transferred back to Great Lakes Hospital, where she could be closer to her family.

Dr. Hollander once again became the physician in charge of her care and he decided to continue Plaintiff on oral doses of Terbutaline after her return. He increased the dosage, however, from 5 mg. every five hours to 5 mg. every 3 hours. Dr. Hollander did not consult with either Dr. Gian or Dr. Meyers, the board certified obstetricians in his department, concerning Terbutaline, even though he had no prior experience administering the drug orally. Furthermore, he conducted no investigation into the characteristics of oral Terbutaline.

Indeed, Dr. Hollander did no formal consultation whatsoever concerning management of Plaintiff's pregnancy prior to performance of her caesearean section with either board certified physician on staff at Great Lakes, despite Plaintiff's history of profuse bleeding and her placenta previa, a condition which he knew was dangerous. Plaintiff had had two prior caesarean sections. The second, performed in 1985, had resulted in an episode of extreme and profuse bleeding. Dr. Hollander testified that he was aware of this earlier bleeding episode. Mrs. Steinhagen's medical history was part of her chart and Dr. Hollander had studied the chart. Moreover, in each of his frequent visits she expressed her concerns for her health, asked for reading materials (which he provided) and again expressed her fears.

On June 26, 1986, the day Dr. Hollander had scheduled and performed Plaintiff's third caesarean section, he had ordered oral dosages of Terbutaline to prevent uterine contractions right up until two hours before surgery. Plaintiff was thus given 5 mg. of the drug at 2:00 a.m., 5:00 a.m. and 8:00 a.m. Surgery commenced at 10:00 that morning.

Dr. Hollander chose to be assisted by Dr. Janice LaBranche, a civilian obstetrician, who also lacked board certification. Dr. Hollander made no attempt to enlist the assistance of either of the board certified obstetricians. In fact, he scheduled Plaintiff's surgery while Dr. Meyers was away from the hospital. Although Dr. Gian was available, he had not been consulted regarding any of the management decisions made, including the administration of Terbutaline up to the time of surgery, nor was he asked to assist.

Dr. Rise Barkoff was the anesthesiologist. A few days prior to Plaintiff's surgery, she reviewed Plaintiff's condition and history. Despite this review, however, according to her testimony she was unaware that Mrs. Steinhagen had received oral Terbutaline two hours before surgery.

Various ultrasound examinations had revealed that a significant portion of the placenta rested on the anterior, or front wall, of the uterus, although most of it was posterior. Nevertheless, Dr. Hollander made a low transverse incision, a horizontal incision identical to Plaintiff's two prior

incisions, low on the abdomen, near the lower uterine segment and close to the placenta and the blood vessels which supply it during pregnancy. The only reason Dr. Hollander gave for his choice of incision prior to surgery was cosmetic. Mrs. Steinhagen testified that when Dr. Hollander had told her he would not "put an anchor on your belly", but would use her old scars, she had told him that she was unconcerned with cosmetic issues, but wanted only the safest method of delivery.

The decision to use a low transverse incision over her two prior incisions, as opposed to a classical vertical incision, was made by Dr. Hollander without consultation with either Dr. Gian or Dr. Meyers. According to Dr. Michael Berke, Plaintiff's expert witness, a classical vertical incision was mandated in Plaintiff's case. This was Mrs. Steinhagen's third pregnancy and she had already requested sterilization by tubal ligation once the baby was removed. She thus faced no risk of rupture during future pregnancies, a risk which otherwise would have militated in favor of a low transverse incision. Further, Dr. Berke testified, the potential for bladder injury is negligible when a vertical incision is performed.

Moreover, a classical vertical incision avoids the placenta and the large, engorged blood vessels which serve it during pregnancy. Dr. Berke explained that blood supply increases vastly at the placental site during pregnancy. Nevertheless, the only doctor with whom Dr. Hollander discussed choice of incision was Dr. LaBranche, a non-board certified physician.

After making the abdominal incision, Dr. Hollander proceeded to do a bladder flap, by which the bladder is dissected and pulled down to move it away from the operative field. Upon dissection of the bladder flap, "brisk bleeding" began, Dr. Hollander testified. After creating the bladder flap, he cut Plaintiff's uterus to reach the infant, again using a transverse incision. Immediately, uncontrolled and massive bleeding occurred. The infant, a healthy baby girl, was delivered.

Plaintiff lost her pulse, her blood pressure plummeted and she turned gray. Additional IVs were added and an anesthetic agent, scopolamine, was administered. The uterus was not contracting, which it normally does after delivery to stop bleeding. Dr. Berke testified that the uterus normally contracts post partum regardless of whether a caesarean or vaginal delivery has been performed.

The placenta was then removed and Dr. Hollander brought the flaccid uterus out of the abdominal cavity, laid it on Plaintiff's abdomen and massaged it in an effort to stimulate contractions. The effort was unsuccessful and Plaintiff went into hypobulemic shock, characterized by low blood pressure and a high pulse rate.

Dr. Hollander, as noted above, had been aware that during Plaintiff's second caesarean section, profuse bleeding had occurred. He also knew that the earlier bleeding episode had been controlled ultimately by the administration of Methergine and Petocin, which drugs are utilized to contract the uterus and stop postpartum bleeding. Yet the medical records fail to indicate that Methergine was ever administered during this June 26, 1986 surgery. Although the anesthesiologist, Dr. Barkoff, testified that she remembered placing a half dose of Pitocin into a half full IV pouch which was hanging at the commencement of hemorrhage, no orders were given to do so and there is no record or recall by anyone else in attendance of either Pitocin or Methergine ever being ordered or administered at all. Dr. Hollander testified that he believes Methergine must have been administered because it is routine, but conceded that the surgical records do not so indicate. The only such drug recorded is the half-dose of Pitocin, given without orders.

The surgical records, which are detailed and list every other drug and blood product which Dr. Hollander claims to have administered during Plaintiff's surgery, fail to indicate anywhere that Methergine was administered by anyone. Dr. Hollander testified that it is standard practice, indeed mandatory not only at Great Lakes but in all hospitals, to document all drugs given to a patient during surgery. As that was

not done here, the Court finds that Methergine was not administered to Christine Steinhagen during the June 26, 1986 surgery. It should be noted here that every witness who had been present in the operating room testified that he or she had never before nor has not since seen such massive or sudden hemorrhaging.

Uterine bleeding may also be stopped or controlled during surgery by ligating or tying off both hypogastric arteries. Dr. Hollander considered this during the emergency, but chose not to make such an attempt because he was uncomfortable doing so. He had never personally performed that procedure before. Nor, prior to Plaintiff's surgery, had he consulted with or attempted to secure the presence of a urologist or anyone with experience in performing such a procedure.

Dr. Hollander determined that Plaintiff's uterus had to be removed to stop the continuing profuse bleeding. He performed a supracervical hysterectomy, which includes not only the removal of the uterus but also of the cervix.

Only after removing Plaintiff's uterus and cervix did Dr. Hollander call urologists in to assist. He testified that he did so because Plaintiff's bladder wall was bleeding and there was blood in her urine. The urologists, Dr. Kidd and Dr. Manson, performed a left hypogastric artery ligation. This procedure slowed down the bleeding considerably.

Dr. Berke testified that had a bilateral hypogastric artery ligation been performed by Dr. Hollander prior to removing the uterus, the bleeding would have been controlled and Plaintiff would not have had to have her uterus and cervix removed.

To remove the cervix, Dr. Hollander palpated the vaginal wall to feel the location of the cervix. He did so by inserting his fingers from above, rather than by going in below, through the vagina. He testified that to attempt palpation from below, through the vagina, would contaminate an open wound by introducing bacteria from the unsterile vaginal area. Dr. Berke, however, testified that this was below the standard of care because Dr. Hollander failed, by going at the cervix from the top, to identify where cervical tissue ended and vaginal tissue began, thereby unnecessarily shortening Mrs. Steinhagen's vagina. Dr. Hollander cut too far down into the vagina to remove the cervix, leaving Plaintiff with an unusually short vagina which makes sexual intercourse painful, indeed virtually impossible.

During the course of the surgery, Plaintiff received more than twice her total volume of blood via transfusions. She was administered 34 units of packed red blood cells, 14 units of fresh frozen plasma, 10 units of platelets, 12,200 cubic centimeters of Ringer's lactate, 67,000 cubic centimeters of normal saline and 1,000 units of Hespan.

Despite the fact that Plaintiff was still bleeding internally, her tissues were becoming friable and the sutures were tearing through, Dr. Hollander decided to sew up the incision. After doing so, he ordered that Plaintiff be sent to the Intensive Care Unit. Her condition at that time was stable but bleeding continued through the night.

Only at this stage of events did Dr. Hollander, by telephone, consult with his former mentor Dr. Kang, the head of obstetrics at Cook County Hospital. Dr. Hollander also told Bruce Steinhagen that his wife could possibly develop, as a result of the surgery, a vesicovaginal fistula, an abnormal opening between the bladder and the vagina. Thus, Dr. Hollander knew then, contrary to his testimony at trial, that damage had occurred during surgery.

Because the internal bleeding would not stop, a second surgery was performed the following day, June 27, 1986. This time, Dr. Hollander was assisted, at his request, by Dr. Kang, a board certified obstetrician-gynecologist, and by several other board certified physicians. The incision from the prior day had to be extended, because it did not give adequate exposure to the operative field. The second surgery also disclosed that a suture had been placed during the first surgery which kinked Plaintiff's left ureter.

All bleeding was stopped during this second surgery, but not until after Plaintiff's left ovary was also removed. Dr. Hollander testified that the ovary was removed because it was necrotic, although the pathology report does not so state.

Plaintiff subsequently did develop a vesicovaginal fistula, as predicted by Dr. Hollander following the first operation. This caused her to suffer a series of bladder infections since bacteria from the vagina entered the bladder through the fistula or opening. The condition also caused her to urinate through her vagina, and to experience pain, bladder spasms and panic attacks. For over a year, she had to change her sheets daily and wear pads and other shields to prevent urine from soiling her clothes, furniture and body, as it had done when she first arrived home. She was unable to go out in public as she could not control the urine escaping through her vagina. These events caused severe embarrassment and humiliation. Plaintiff consulted various mental health professionals on a regular basis. Her treatment continues to this day.

The fistula persisted for thirteen months, until it was repaired in late September, 1987 at Henry Ford Hospital in Detroit, Michigan, after Plaintiff's husband was transferred by the Navy to Michigan.

Plaintiff consulted Dr. Hollander after she was released from Great Lakes concerning the urinary problems she was experiencing, but he insisted that her problem was nervousness and a failure to adjust to the hysterectomy. However, the testimony shows and this Court finds that the vesicovaginal fistula resulted from injury to Mrs. Steinhagen's bladder during the June 26, 1986 surgery.

In February, 1989, Plaintiff sought treatment for abdominal pain and was admitted to Bon Secours Hospital in Grosse Pointe, Michigan, where her right ovary was required to be removed due to an ovarian cyst. The operation to remove the right ovary revealed that it was located in the retroperitoneal area, outside of its proper location within the abdominal cavity. Dr. Berke testified that it would have had to have been placed there during one of the two surgeries at Great Lakes. Defendant's witnesses testified that it may have been pushed retroperitoneal by scar tissue; but all agree that the surgery caused its exclusion.

Due to the removal of both her ovaries, Plaintiff must now receive estrogen replacement therapy, which places her at high risk for hypertension, blood clots and liver tumors. Estrogen replacement also causes mood swings, agitation and tiredness.

■ This case is governed by the substantive law of the state of Illinois. In order to establish a prima facie case of medical malpractice, a plaintiff must prove the standard of care by which the physician's treatment is measured, a deviation from that standard of care and proximate cause, i.e., that defendant's deviation from the standard of care caused plaintiff's injuries. *Ramos v. Pyati*, 179 Ill.App.3d 214, 128 Ill.Dec. 290, 534 N.E.2d 472 (1989).

Plaintiff presented expert testimony as to all three elements, which the Courts finds credible. Dr. Michael Berke, a highly credible board certified obstetrician-gynecologist who has treated approximately 25 complete placenta previas during training and many years of practice, testified that the standard of care called for Dr. Hollander to formally consult with board certified physicians long prior to surgery to determine the course of management of this pregnancy, including whether Terbutaline should have been discontinued long enough before surgery so that Plaintiff's uterus would contract when necessary.

Dr. Berke also testified that the effect of oral Terbutaline is more variable and of greater duration, as absorption differs from Terbutaline by injection. He added that 5 mg. every 6 hours would have a duration of 8 hours in the system. Thus, he concluded, it was below the standard of care to administer the drug to Plaintiff so close to surgery, as nothing could be gained from doing so and it would only create the problem which occurred in this case: a flaccid uterus in which hemorrhage cannot be controlled.

Dr. Berke also testified that the standard of care required Dr. Hollander to consult with board certified physicians as to the choice of incision in this unusual case and to perform a vertical incision to avoid the placenta. Indeed, he stated that it was below the standard of care not to do everything possible to minimize the chance of bleeding, especially given Plaintiff's history of bleeding during delivery and her complete placenta previa. A vertical incision, he testified, would have eliminated the profuse bleeding and no bladder flap would have been necessary had that type of incision been performed.

Dr. Berke testified further that a hypogastric ligation should have been performed before the hysterectomy, in an attempt to salvage Plaintiff's uterus. It was accordingly below the standard of care not to have present a physician competent to perform a ligation when undertaking a scheduled caesarean section in a case presenting the known complications which Plaintiff's case presented.

Dr. Hollander should also have placed his hand through the vagina and reached for the cervix that way in order to feel where the vagina began and the cervix ended. This would have prevented the vaginal shortening which resulted. It was below the standard of care not to do so, said Dr. Berke. The Court credits the testimony that the surgery caused a foreshortening, and finds that even if some other method of locating the cervix were appropriate, Dr. Hollander's haste, which was due to his own poor planning and failure to consult, caused this error.

As to the failure to administer Methergine, Dr. Berke testified that even if the half dose of Petocin had been administered, it was below the standard of care not to administer both drugs, because the standard requires that all possible means be used to control the bleeding. In addition, he stated that all of the other measures available should have been attempted before choosing to perform a hysterectomy.

Dr. Berke testified that removal of Plaintiff's left ovary during the second surgery would have been prevented had the first surgery been handled properly. He testified that the pathology reports do not bear out Dr. Hollander's statement that the ovary was necrotic.

According to Dr. Berke, the blood in Plaintiff's urine which caused Dr. Hollander to call in the urologists was most likely caused by injury to the bladder during the first surgery.

Dr. Berke testified that the vesicovaginal fistula from which Plaintiff suffered for the next thirteen months could have been caused by the hysterectomy, the dissection of the bladder flap (which was only necessary because of the transverse incision) or by trauma to the bladder during the second surgery. He concluded that it was more probably caused by trauma during the second surgery.

Dr. Berke's examination of Plaintiff revealed atrophy of the vagina and a shortened vagina. He stated that Plaintiff's was the shortest vagina he had ever seen except for those of patients with significant vaginal removal due to cancer, and that it was no more than one-half the length of a normal vagina.

Defendants called Dr. Ronald Burkman as their expert witness. Dr. Burkman testified that the 8:00 a.m. dosage of Terbutaline the morning of Plaintiff's first surgery had a limited effect. He did not say that it had no effect, however, and the court does not credit his testimony that Dr. Hollander did not fall below the standard of care in administering Terbutaline close to surgery. His testimony constituted an uncritical endorsement of all of Plaintiff's course of care at Great Lakes Hospital.

Nor does the court credit Dr. Burkman's testimony that a transverse incision was not below the standard of care, because he testified that "[i]n individuals where you think that you may encounter the placenta, because it appears to be anterior, ... then you are advised clearly to use a vertical incision...." He also stated "If there's any question, you use perhaps a vertical incision." Finally, he conceded under cross examination that at his deposition he testified that most doctors would use a classical

vertical incision if the placenta were anterior.

Here, ultrasound studies had demonstrated that the placenta was partially anterior, and Dr. Hollander should have performed a vertical incision to avoid all risk. No medical reason has been presented for preferring the transverse incision in this case. It fell below the standard of care to know all that Dr. Hollander did of Plaintiff's condition and yet to fail to act on that knowledge by stopping the Terbutaline well before surgery and performing the correct incision.

The Court notes that Dr. Burkman is the recipient of substantial grants from the federal government, the defendant herein, for research and testing activities. His testimony was thus vulnerable to a degree of bias. Moreover, Dr. Burkman is on staff at Henry Ford Hospital, the director of which has written to all physicians on staff, ordering that none testify as a plaintiff's expert in Michigan. Dr. Burkman does, however, testify for defendants in medical malpractice cases.

Dr. Burkman also testified that Dr. Hollander's lack of board certification was not problematic, as he was well qualified to perform Plaintiff's surgery. However, Dr. Burkman also stated that Henry Ford Hospital uses only board certified obstetrician-gynecologists. He also conceded that at his deposition, he had testified that Dr. Hollander was one year from completing his training at the time of Plaintiff's surgery. Therefore, his testimony at trial that Dr. Hollander was, despite his lack of board certification, more than qualified to perform Plaintiff's surgery is not completely credible.

Nor does the Court find credible Dr. Burkman's trial testimony that it was within the standard of care to fail to administer Methergine once the bleeding started. Here again, Dr. Burkman's testimony conflicted with that at his deposition, where he testified that Methergine should be the approach used.

Dr. Burkman further testified at his deposition that he was not sure Plaintiff's left ovary was necrotic during the second surgery, based on the pathology report. Yet at trial he said that the pathology report contained "a suggestion" that the ovary was necrotic.

In summary, the Court finds that Plaintiff has proved that she was the victim of medical negligence while a patient at Great Lakes Hospital. Dr. Hollander fell below the standard of care when he presumed his competence to handle any eventuality without any prior consultation and without an assisting board certified obstetrician-gynecologist or urologist. In light of the fact that a significant portion of the placenta was anterior, the lack of consultation with board certified doctors regarding the choice of incision was below the standard of care, as was the administration of oral Terbutaline, without first researching its effects and use. These acts were clearly negligent with a high risk patient whose risks were known far in advance of surgery and who was under the total control of the hospital and its staff.

The profuse bleeding encountered during the first surgery was the direct result of the Terbutaline, the improper choice of incision and Dr. Hollander's inexperience in performing procedures such as bilateral hypogastric artery ligation to stop such bleeding, and the failure to administer Methergine.

█ In addition to the pain, humiliation and depression which Plaintiff suffered as a result of the vesicovaginal fistula, she also developed hepatitis as a result of the many blood transfusions necessitated by these surgeries. Indeed, the fistula repair had to be postponed due to the discovery of the hepatitis. Dr. S Petersen's report states: "Repeat biochemical profile ... showed an elevation of her liver function studies. Because of this problem not being fully worked out, with the possibility of hepatitis associated with a very large number of transfusions which she had at the time of her ... ceasarean section and hysterectomy ..., we are cancelling her surgery and will get medical re-evaluation." Later, when Plaintiff sought treatment at Bon Secours Hospital in Grosse Pointe, Michigan, where her right ovary was re-

moved, doctors noted that "[h]er past medical history is significant for hepatitis secondary to blood transfusions, non-A, non-B." A memo from Henry Ford Hospital dated October 7, 1987, states that Plaintiff's diagnosis is "urinary-genital tract fistula and hepatitis, unspecified." Another Ford Hospital internal memo directed to Dr. Alexander Dekovich and dated March 12, 1987 states that "she developed a post-op hepatitis documented in November, 1986, which most likely ... is a non-A, non-B hepatitis." Ford Hospital records also indicate that she was treated for hepatitis with vaccinations: "She has begun her series of hepatitis B vaccinations. She is waiting to receive her third shot. She has a history of nonA/nonB hepatitis which was a result of multiple blood transfusions." Ford Hospital doctors decided that while repairing the fistula, they would also perform a liver biopsy. Plaintiff was discharged from Ford Hospital on September 30, 1987 and her final discharge notes state: "FINAL DIAGNOSES: 1. Hepatitis. 2. Vesicovaginal fistula." Accordingly, Defendant's continued assertions throughout trial that there was insufficient evidence of hepatitis in the record and Defendant's post-trial motion requesting that the Court dismiss all issues relating to hepatitis are without merit, and that motion is hereby denied.

Worry about this additional medical problem only increased Mrs. Steinhagen's already precarious mental state. She began to worry that she had contracted AIDS from the transfusions and her concern over her health became a preoccupation which caused her to lose both sleep and her ability to concentrate. She often cried, had dizzy spells and became easily fatigued. She was unable to have sex with her husband due to the fistula and to her worry that she might give him hepatitis or AIDS. She laundered her clothes separately from those of her husband and children and used a separate bathroom. She continued psychological counseling to help her cope and took Xanax and Valium, antidepressant drugs.

Moreover, for some time following surgery Plaintiff was unable to work and consequently lost a much desired employment opportunity. She was offered and could not accept a research assistant's position at Wayne State University because of the delay in repairing the fistula, which in turn was necessitated by the hepatitis.

Having found medical negligence and severe physical, psychological and economic damage to Mrs. Steinhagen, the court will accordingly enter judgment for Plaintiff for three hundred thousand dollars.

SO ORDERED.