MILTON ROSENSTEIN et al., Plaintiffs-Appellees, v. THE CHICAGO TRANSIT AUTHORITY et al., Defendants-Appellants.

(No. 58312: ▮▮▮▮▮)

First District (4th Division)—June 13, 1973.

James G. O'Donohue and Jerome F. Dixon, both of Chicago, for appellants.

Reibman and Hoffman, of Chicago, for appellees.

Mr. PRESIDING JUSTICE BURMAN delivered the opinion of the court:

This is a personal injury action brought by Milton Rosenstein and his son, Howard, against the Chicago Transit Authority and its driver, Richard Trefny. The case was tried before the court without a jury, resulting in a judgment for $36,000 in favor of Milton Rosenstein (hereinafter referred to as plaintiff) and $100 in favor of Howard Rosenstein, his nine year old son who was a passenger in the car. The defendants appeal.

The sole contention presented for review is that the damages awarded to plaintiff were excessive.

The record discloses that on July 6, 1969, at about 8:15 P.M., plaintiff's car was struck while he was stopped at a red light at the intersection of Peterson and Maplewood Avenues. The bus driver, defendant Richard Trefny, testified that the bus was about 90 feet away from the Rosenstein car when he first applied the brakes. He stated that the pavement was slippery. When he hit the brakes, the bus turned sideways and he lost control of it momentarily. It straightened out just about the time it collided with plaintiff's car. Trefny said that the Rosenstein car was struck hard enough to knock it into the car ahead of it. He also testified that he did not use the emergency brake or sound the horn prior to hitting plaintiff's car. The bill for repairs to the Rosenstein automobile was $385.80.

Plaintiff, Milton Rosenstein, testified that he was 49 years old and had been employed by the police department for 25 years. His present rank is lieutenant. Plaintiff testified that immediately after the accident, he

noticed that the lower part of his back and the upper part of his back near the neck hurt. The next day he went to see Dr. Clarence A. Peckler, who gave him a heat treatment. The following day, on the advice of Dr. Peckler, plaintiff entered Bethesda Hospital, where he stayed for 11 days. The lower part of his body was put in traction and he had a surgical collar around his neck. He was also given physical therapy. Plaintiff described the traction as a pulley type contraption on his legs. He stated that it was very uncomfortable to sleep in the traction device. Plaintiff also testified that he experienced sharp pain from the hip to the lower thigh in the left leg which prevented him from walking. He also experienced pain in the neck.

Plaintiff testified further that he continued to have the same pains when he was discharged from Bethesda Hospital although he was able to walk a little bit better. He continued to see the doctor for several months after his discharge from the hospital, receiving heat treatments on his back several times a week. In February, 1970, plaintiff again saw Dr. Peckler because his condition had worsened. He had tingling pains in his left hand, his shoulder and neck hurt and he had severe headaches. Dr. Peckler gave him more heat treatments. On February 21, 1970, plaintiff entered Edgewater Hospital, where he stayed for about three weeks. He was in severe pain and in traction for the better part of that time. He continued seeing Dr. Peckler for a couple of months after he was discharged from the hospital. At the suggestion of Dr. Peckler, plaintiff also saw Dr. Milton Tinsley, a specialist in neurological surgery.

Plaintiff further testified that he continued to have the same pains he had when he left the hospital. He said he couldn't lift his head and had pains in the arm, neck and head. Plaintiff stated that several times a week, he had sharp pain from the lower back to the left thigh which prevented him from walking. He also said that there were many things which he could not do because of his condition.

The only medical witnesses who testified as to plaintiff's physical condition were Drs. Peckler and Tinsley. Dr. Peckler stated that when he first saw the plaintiff, he had neck and back pains, and couldn't move the neck or back or walk without pain. His examination revealed a tenderness and spasm of all the neck muscles. Plaintiff had a great deal of pain in moving the neck and therefore the range of motion was restricted. In the lower back, he had tenderness over the fourth and fifth lumbar vertebra. The muscles alongside the vertebra on each side were tender and spastic. Plaintiff held his body in a stiff manner and he walked very slowly in order to decrease his pain symptoms. Dr. Peckler diagnosed the plaintiff's injury as a severe whiplash neck type injury with a strain in the neck and in the lower back.

Dr. Milton Tinsley testified that he examined plaintiff in May, 1970. Plaintiff complained of pain in the neck, arm, hip and leg. Dr. Tinsley took a general neurological examination of plaintiff and he examined certain of the X-rays taken at Edgewater Hospital in February, 1970. His diagnosis was "osteoarthritis with spur formation involving C5 nerve." His opinion was that the spur was in existence prior to the accident. He recommended that plaintiff have a myelography and if the myelography confirmed his diagnosis that the nerve be decompressed by a laminatomy. Dr. Tinsley testified that there is a certain minimal risk of discomfort and possibly other complications in a myelogram. He stated that there is always a risk in a laminatomy of hemorrhage, infection and anesthetic involvement.

Dr. Tinsley further testified that if a laminatomy were performed, plaintiff would be hospitalized for two to two and a half weeks. The cost of a hospital stay would be about $100 a day, plus additional charges for the operating room, X-rays and medication of about $1000. The surgical fee for the myelogram would be about $100 and about $750 for the laminatomy. Plaintiff would be incapacitated for six weeks to two months following the surgery. In answer to a hypothetical question, Dr. Tinsley stated that in his opinion plaintiff's pre-existing condition was aggravated as a result of the accident. He further testified that the condition would be permanent and would cause pain if no surgery were performed.

The defendants strongly urge that the trial court misconceived the law of damages resulting in an award contrary to law and requiring a reversal. This argument is based on the fact that after the trial judge assessed the damages he said,

> "In the event that it becomes interesting to anyone as to how I arrived at the particular amount of the verdict, I took all the specials to date, including and also the projected specials, and multiplied by three and added three thousand dollars for the pain and suffering, which I have no doubt the plaintiff has been and will experience until he submits to this surgery."

Defendants' counsel, in his brief, comments that it is a fact of common knowledge among lawyers that personal injury liabilities are paid by settlements where liability is either clear or close, based upon a rule of thumb of three times the special damages. We subscribe to the fact that this procedure in settling tort matters is generally practiced in Cook County. We hasten to point out, however, that this litigation was not amicably settled, but proceeded to a contested trial. We must therefore determine whether the award of damages was excessive without regard to the conclusionary remarks of the trial judge.

It has been repeatedly held that the goal of an award of damages is fair and reasonable compensation. (*Swearinger v. Klinger*, 91 Ill.App.2d 251, 256, 234 N.E.2d 61, 63.) The record shows and the parties agreed that Milton Rosenstein had a total of $5700 in actual damages consisting of medical bills, hospital bills and lost time from work. The future expenses, should plaintiff submit to an operation, were projected as a hospital bill of approximately $2500, surgical fees of $850 and about $1800 in lost wages totalling $5150. Adding this figure to the sum of $5700, plaintiff's actual and future damages total $10,850.

■■■ The defendants argue that it is inconceivable that plaintiff would be entitled to an award for a future operation which he has refused to have. We do not find this argument persuasive. When plaintiff was asked why he had not submitted to an operation, he replied,

"First, no money. I didn't have the money to pay for something like that, or another reason was I saw too many cases of permanent damage, crippling of a person that where a knife may have slipped a little bit and I am familiar with some of the people that that happened to. I'm scared of an operation unless it's absolutely, unless I'm flat on my back, and I can't do anything else."

The plaintiff testified to extensive pain and suffering as a result of his present condition. Dr. Tinsley's statement that in his opinion, if no surgery were performed, the condition would be permanent, was uncontradicted. Under these circumstances, it seems reasonable to assume that the plaintiff will eventually submit to surgery. If he does, he will not be able to recover additional damages in any subsequent lawsuit against defendants. The plaintiff can recover for future foreseeable damages only in the instant proceeding. For this reason, we think the trial judge did not err in including the expense of a foreseeable future operation in calculating plaintiff's special damages.

■■ Defendants also maintain that the trial court should have considered the fact that plaintiff's condition could have been corrected and his damages thereby mitigated had he agreed to surgery. We disagree. In *Rockford Clutch Division v. Industrial Com.*, 34 Ill.2d 240, 215 N.E.2d 209, the claimant refused the employer's offer to pay the cost of surgery similar to the operation needed by this plaintiff. The supreme court rejected the employer's argument that the employee could not claim total disability because he refused to help himself by having surgery. Justice Schaefer, in speaking for the court stated:

"The Workmen's Compensation Act is not designed simply to protect employees who follow the best medical opinion of the day. It is designed for employees with divergent personalities, belief, and fears. If a claimant's response to an offer of treatment is

within the bounds of reason, his freedom of choice should be preserved even when an operation might mitigate the employer's damages." 34 Ill.2d at 247-8, 215 N.E.2d at 212.

To the same effect is *Florczak v. Industrial Com.*, 381 Ill. 120, 44 N.E.2d 836.

■■ There is no contention that the amount of the judgment was so excessive as to indicate passion and prejudice by the court. The damages assessed must be examined in the light of the particular injury involved. (*Lau v. West Towns Bus Co.*, 16 Ill.2d 442, 453, 158 N.E.2d 63, 69.) In *Lau*, the plaintiff, a woman of 50, sustained a fracture of the right femur requiring surgery. She was unable to walk without crutches for almost three years and had a stiffening of the right hip joint and knee. Her condition was progressive and permanent. She had incurred special damages of $1500 and there was testimony that she would have to submit to an arthroplasty to separate the head of the femur from the acetabulum. The Supreme Court in affirming a judgment in the amount of $75,000, commented that although the award was large in comparison to plaintiff's actual expenses, "we cannot limit compensable damages for pain and suffering to a set percentage of medical, hospital and kindred expenses." 16 Ill.2d at 453, 158 N.E.2d at 69.

■■ . In the instant case, the plaintiff suffered a serious disability as a result of defendants' negligence. He underwent two periods of hospitalization and treatment and incurred substantial medical bills. In addition, he has experienced extensive pain and suffering and will continue to do so. He has difficulty in walking and is prevented from engaging in many of his normal activities. The uncontradicted testimony was that this condition is permanent unless the plaintiff agrees to undergo surgery. Under these circumstances, we cannot say that the judgment for the amount of $36,000 awarded to Milton Rosenstein by the trial court was so excessive as to be against the manifest weight of the evidence.

The judgment of the circuit court is therefore affirmed.

Affirmed.

ADESKO and DIERINGER, JJ., concur.