BETTY SEYMOUR, Plaintiff-Appellant, *v.* VICTORY MEMORIAL HOSPITAL, Defendant-Appellee.

Second District   No. 76-351

Opinion filed May 23, 1978.—Rehearing denied June 22, 1978.

Collins, Stepanich & Collins, of Waukegan, for appellant.

Hinshaw, Culbertson, Moelmann, Hoban & Fuller, of Chicago, for appellee.

Mr. JUSTICE RECHENMACHER delivered the opinion of the court:

The plaintiff in this case appeals from a directed verdict for the defendant in an action brought by plaintiff for injuries she received from burns while she was a patient in the defendant hospital. The complaint is in two counts, count I being based strictly on negligence in that the hospital negligently allowed the plaintiff, while under heavy sedation, to obtain smoking materials and use them while unsupervised, resulting in her being painfully burned. Count II is based on the theory of *res ipsa loquitur* in that the hospital had exclusive control of the plaintiff while under its care and was exclusively responsible for any injury that occurred to her. In its answer the defendant hospital denied it was in any way negligent and asserted that the plaintiff was not at the time of the injury complained of in the exercise of due care for her own safety.

The plaintiff, Betty Seymour, was admitted to Victory Memorial Hospital on October 16, 1972. She was quite overweight and was being treated for a painful back condition. Because of her constant pain, sedative drugs such as Demerol and Valium were prescribed and one of the side effects of such drugs is drowsiness. The plaintiff was an addictive cigarette smoker, smoking about two packs of cigarettes a day, if she could obtain them. The nurse on duty, when she learned of this, told the head nurse that she thought the plaintiff should not be allowed to smoke unless a nurse or visitor, such as her husband, was present to see that she did not fall asleep while smoking. Accordingly, her cigarettes and lighter were taken away and she was told that they would be kept at the nurses' station on her floor. The plaintiff was instructed by her nurse that when she wanted to smoke, she could call for a nurse and a cigarette would be brought to her, and the nurse would stand by while she smoked it.

The plaintiff did not protest this arrangement. However, her demands for cigarettes—15 to 20 a day—put a strain on the nurses' time.

Apparently they did not always have the time to bring her a cigarette when she had the craving for one and so she attempted to, and sometimes did, obtain cigarettes from other sources such as by "bumming" them from persons passing by in the hall. There was some testimony that at least on one occasion she had obtained a cigarette from the "cleaning lady" (though there was no testimony linking this incident to the fire).

In any event, on October 19, 1972, about three days after she was admitted to the hospital, and after she had been instructed as to smoking procedure by her nurse, the plaintiff attempted to light a cigarette without the nurse being present. She inadvertently dropped the match, before it was fully extinguished, and she suffered the burns complained of before the nurse could come to her aid and extinguish the flames. The source of the match and cigarettes was a matter of contention in the trial of the case.

The nurse on duty, Betty Nerroth, testified she daily checked the drawers in the stand at the plaintiff's bed and took away any cigarettes she found. Nurse Nerroth testified that on the morning of the day when the plaintiff was burned she found cigarettes in the plaintiff's drawer and took them away. The time sequence is not entirely clear from the testimony, but apparently this was around 8:30 a.m. and was somewhat before a Mrs. Fowles made her appearance at the plaintiff's room. Mrs. Fowles was a volunteer worker in the hospital who brought a cart to all of the five hospital floors every day and stopped at every room to see if the patients wanted anything from the cart, which contained toilet articles, snacks, candy and cigarettes. Mrs. Fowles testified at the trial that she sold cigarettes the morning of the fire to one of the patients on the fifth floor who, she was told later, was burned while lighting a cigarette. However, Mrs. Fowles did not actually identify the patient she sold the cigarettes to as being the plaintiff. The plaintiff was in a two-bed room, her roommate being Mildred Camp. Whether Mrs. Fowles sold the cigarettes in question to the plaintiff, or to Mildred Camp, was not directly established by Mrs. Fowles' testimony. She daily delivered her wares from the cart to patients on five floors of the hospital and it is not strange that she could not later positively identify the person to whom she sold a particular pack of cigarettes, in a certain room, on one of the five floors.

It is the theory of the plaintiff's case that the cigarettes and the match which accompanied them, and which the plaintiff was attempting to light the cigarette with, were sold to the plaintiff on the fateful morning by Mrs. Fowles, and that this constituted negligence on the hospital's part, therefore, the identification of the plaintiff as the person to whom Mrs. Fowles sold the cigarettes was of critical importance to the plaintiff's case. We believe, however, that such identification was not established by Mrs. Fowles' testimony, which was as follows:

"Q. Now, would you tell us what occurred when you took your cart to the room on that morning to her?

A. Well, I just did the usual thing, knocked on the door and said, 'Good morning. Does anybody want anything from the shopper's cart?'. And *a woman lying in one of the beds* said, 'Yes, I would like some cigarettes'. And I believe they were in a green package. So, I assume they were Kool cigarettes. * * *

Q. This woman that you spoke with, is this the woman that was later burned?

A. I guess she was, *from what I hear*, yes.

Q. Now, is there anything else that makes you recall this specific sale to her that morning? Is there anything that she said to you that —

A. Not at that particular time, sir, no." (Emphasis added.)

This was all of Ruth Fowles' testimony that was pertinent to the identity of the plaintiff, Betty Seymour, on her direct examination. On cross-examination, in answer to the question, "Mrs. Fowles, this lady by the way, do you recognize Mrs. Seymour as being the—," she interrupted, answering "I really don't know, sir, I don't."

It is quite obvious from this testimony—as indeed it would be from the range of her activities over five floors of the hospital—that Mrs. Fowles did not and could not identify the plaintiff as the person to whom she sold a particular pack of cigarettes on the day in question.

It is the defendant hospital's contention that the match which burned the plaintiff was not received by her from Mrs. Fowles but that the plaintiff's roommate, Mildred Camp, bought the cigarettes and the book of matches which accompanied them, this contention being based upon the plaintiff's own testimony.

It would be supposed that the testimony of Mildred Camp, plaintiff's roommate, would be decisive on this point. However, her testimony at trial was quite unclear, due to her preoccupation on the day of her testimony caused by her intense concern over her mother, whom Mildred Camp had just been informed had suffered a heart attack in another State. Mildred Camp, as a consequence, was on the point of leaving to go to her mother in Arizona, when she was called to testify. After she had begun her testimony there was an objection by defense counsel as to leading questions, as the result of which there was a conference in chambers. In that conference plaintiff's attorney, to justify his leading questions, said:

"The offer of proof would be, Mrs. Camp told me her mother had a heart attack, she is quite upset, she came and she has pains around her own heart, she feels dizzy and has headaches, and I am trying to get her testimony so she can go.

· Obviously she is in a state that she's excited and *can't remember.* I think I should have leniency or latitude to lead her a little bit." (Emphasis added.)

The trial court then permitted the examination with considerable latitude as to leading questions. However, it was obvious that the witness was not in a condition to have a very clear and satisfactory recollection (in 1976) as to the events of October 19, 1972. In any event, Mildred Camp did not testify that the plaintiff herself bought the cigarettes in question. She testified generally that the plaintiff was her roommate, that she was "always sleeping," that she had no conversation with her, but in answer to a leading question, she recalled the plaintiff at one time sitting up in bed and saying she thought she was going to fall out of bed, and that once a cleaning lady (not Mrs. Fowles) brought the plaintiff a cigarette. However, in answer to the direct question, "Do you recall when you saw the cart on the day of the fire?" she answered that she could not remember.

Thus, we think it is fair to say that of the three people allegedly directly involved in the sale of the cigarettes, Mrs. Fowles, Mildred Camp and the plaintiff, Betty Seymour, neither Mildred Camp nor Mrs. Fowles had a clear recollection of what transpired on that morning. There remains then the testimony of the plaintiff herself which we believe is dispositive of the contention that Mrs. Fowles sold the cigarettes and matches which produced the fire to the plaintiff herself. We reproduce this testimony in full, since it is of critical importance not only as to the plaintiff's understanding of the hospital's prohibition of her smoking, while unsupervised, but also on the particular circumstances indicating how the fateful cigarette and matches were obtained. Bearing in mind that the nurse, Betty Nerroth, testified that she had found and removed cigarettes from the plaintiff's drawer about 8:30 a.m. on that day, and that Mrs. Fowles testified she came to the fifth floor of the hospital around nine o'clock that day, as usual, the following testimony of the plaintiff is of considerable significance.

"Q. * * * Tell the Jury how long it was before they said something about your cigarettes?

A. Well, I had cigarettes and my lighter. And then the doctor said he would sedate me. So, then, the nurses said they were going to come in and take them away. They took my cigarettes and lighter, and they said they would keep them there at the desk, if I wanted a cigarette to ring them, and they would bring me one, and someone would stay with me while I smoked it.

* * *

Q. And were you in traction when Mrs. Fowles came around with the cart to sell the cigarettes?

A. I don't remember.

Q. Okay. Now, do you recall a purchase of some cigarettes on that morning?

A. Honestly, I can't say that I did.

\* \* \*

Q. All right, now you remember October 19, 1972, was the day of the fire?

A. Yes, sir.

Q. And at about 11:00 a.m. on that day you told your roommate that you wanted a cigarette, isn't that correct?

A. Yes, sir.

Q. And that morning when the cart had come around, your roommate had bought a pack of cigarettes for you, didn't she?

A. I thought she had bought them.

Q. And that was a pack of Pall Malls, wasn't it?

A. Yes, sir.

Q. She came over and put the cigarettes in your drawer, didn't she?

A. To the best of my knowledge.

Q. And she told you she bought you the cigarettes, she was tired of hearing you holler for cigarettes?

A. Yes, sir, I understood her to say that.

Q. And at that particular time, around 11:30 or 12:00 that day, when you were reaching to turn on your light to ask a nurse for a cigarette, your roommate told you, 'There is a pack in your drawer,' is that right?

A. Yes, sir.

Q. That was the first you knew that she had put them there, isn't that correct?

A. That's the way I remembered it.

Q. She could see you reaching for the light, isn't that right?

A. I think she could.

Q. Even though the bed was situated the way they were in that room, she had no trouble seeing you when you reached for the light, did she?

\* \* \*

Q. You could see her head, that is, her eyes, couldn't you?

A. Yes, sir, if I was looking at her I could see her.

\* \* \*

Q. When you were reaching for the cigarettes, there were matches in the drawer, too, weren't there?

A. Yes, sir.

Q. They come with the cigarettes?

A. Yes, sir.

Q. Now, you normally used a lighter, didn't you?

A. Yes, sir.

Q. You had already had a cigarette earlier that morning, hadn't you?

A. Yes, sir."

There was also testimony by Ruth Fowles to the effect that she saw no "No Smoking" signs in the room occupied by the patient who was burned and that if she had seen any such signs she would not have sold cigarettes to an occupant of that room.

At the close of all the testimony, the defendant moved for a directed verdict which the court granted, stating in his order granting the motion that the plaintiff "has failed to present sufficient evidence to create a question of fact for the jury's consideration."

In this appeal from that ruling the plaintiff raises three contentions: (1) that expert testimony (of which there was none) is not required to prove negligence of a hospital for injuries suffered by a patient where the hospital's negligence is grossly apparent or is such as to be within the comprehension of laymen; (2) *res ipsa loquitur* applies to cases involving hospital negligence, and (3) testimony of a registered nurse, an employee of the hospital, is sufficient to establish the standard of reasonable conduct or duty of care.

■■ While it is a temptation to consider and decide the issues raised by the plaintiff in her appeal, we feel it would be inappropriate for us to do so in view of our considered opinion that the plaintiff's case must fail, in any event, because her own deliberate acts which intervened between the hospital's alleged failure of duty and the actual injury constituted contributory negligence as a matter of law. The plaintiff's admissions under cross-examination clearly established that she was rational enough to follow the procedure set up by the nurses and that she was on the point of ringing for a nurse to bring her a cigarette when she was told by her roommate that there were cigarettes in her drawer and that she was able to obtain the cigarettes and matches from the drawer and light the cigarette, intending to smoke without a nurse present. She shook the match and thought it was out and dropped it before it was actually extinguished. This could happen to anyone. She did not fall asleep with the lighted cigarette in her hand—the lighted cigarette was, according to her own testimony, in the ashtray when she realized that the match itself was still smoldering and had caught her gown on fire. The plaintiff was partly in traction which prevented her from helping herself effectively to extinguish the smoldering gown. Thus, she suffered burns before a nurse could be summoned to extinguish the fire.

■■ It is contended by the plaintiff that due to her sedated condition—which the hospital was well aware of—and had participated in through

the nursing staff—the plaintiff was incapable of contributory negligence. It is alleged in the complaint that the hospital "carelessly and negligently encouraged and permitted the sale of smoking materials to the plaintiff and others at a time when plaintiff was not *physically* responsible due to injections of analgesics." (*Emphasis added.*) The complaint does not allege and the plaintiff's own testimony fails to establish that the plaintiff at the time of the injuries complained of was not *mentally* capable of realizing that she was violating her nurses' instructions. Indeed, her testimony, under cross-examination, indicates that she had intended to ring for the nurse, before she learned there were already cigarettes in her drawer, thus she was conscious of the correct procedure. Moreover, her testimony does not indicate that she was so fuzzy-minded that she forgot to extinguish the match after she lit it, or fell asleep. Her testimony was that she shook the match and thought it was out. The testimony at trial indicated the plaintiff usually lit her cigarettes from a lighter, or had them lit for her. On the occasion in question, she used a flimsy book match, and dropped it onto her gown before she had completely extinguished it. Whether or not the accident would have occurred if the plaintiff had not been under sedation is a matter of pure speculation. It would be a very risky thing to attempt to light a cigarette from a book match while lying in bed in traction, whether sedated or not. It may be argued that the sedation made the plaintiff clumsier and less adept at handling the match than if she had not been sedated, but the sedation *did not cause* the risk, it merely increased it. The hospital was administering the sedation, but in doing it was following the plaintiff's doctor's orders. Thus, the hospital was not responsible for the actual drugged condition of the plaintiff. The hospital nurses had responsibility up to a certain point because of their awareness of the plaintiff's vulnerability to falling asleep suddenly and involuntarily and for that reason they imposed supervision on her smoking. She was fully aware of this and while the evidence may have tended to show that she was *physically* impaired, there was no evidence that she was not rational. Thus, she was fully capable of appreciating the danger to which she was subjecting herself in evading the stricture as to supervision of her smoking.

The plaintiff in oral argument invoked this court's decision in *Dezort v. Village of Hinsdale* (1976), 35 Ill. App. 3d 703, but the case before us is readily distinguishable from that case, in our opinion. In the *Dezort* case, the plaintiff's husband arrived home at about 3:30 a.m., intoxicated and in a very depressed state. He expressed the fear that he was on the point of committing suicide and requested the police be called to protect him from himself. When the police arrived the decedent repeatedly demanded that the officers shoot him, and finally attempted to take one of the officers' guns and shoot himself. After a struggle, he was handcuffed

and driven to the police station, where he was charged with disorderly conduct and about 5:20 a.m. was placed in a cell by himself. At that time it was noticed that he looked "strange." At 7:08, Dezort was found dead in his cell, having hanged himself with his belt, which he had been wearing when he was arrested. In an action for a wrongful death, brought by Dezort's widow, the trial court granted the Village's motion for a directed verdict, one of the grounds for which was that the plaintiff's decedent was guilty of contributory negligence because his suicide was induced by his own voluntary act of becoming intoxicated.

In reversing the trial court, this court said (on the issue of contributory negligence):

> "The finding that decedent voluntarily became intoxicated and while in that condition engaged in an act which, objectively, could be characterized as voluntary and which proximately caused the death does not show contributory negligence as a matter of law. The relevant inquiry is whether the decedent in his condition was incapable of exercising due care for his own safety and whether the persons charged with responsibility toward him knew or reasonably should have known of his incapability." (35 Ill. App. 3d 703, 711.)

The phrase "whether the decedent in his condition was incapable of exercising due care for his own safety," obviously referred to his *mental* state, which was clearly extremely deteriorated.

In the present case the complaint refers only to the plaintiff's "physical" condition. The hospital was well aware of this physical condition and took steps to guard against the plaintiff injuring herself because of such physical condition. In the *Dezort* case the village was equally aware of the decedent's *mental* condition, but rather than guarding against it they invited that which they knew, or should have known, to be possible or even probable, by isolating him in a prison cell, unguarded and unsupervised. The hospital on the contrary made a concerted effort to save the plaintiff from her own folly and all that can really be said against the hospital is that the precautions it took were not foolproof. There is no evidence suggesting that the plaintiff in our case did not understand the regulations or was unable to appreciate the danger. She dropped the match inadvertently, not deliberately, and lit the match as a rational act in order to light a cigarette. We see a distinct qualitative difference as to the contributory negligence issue in the *Dezort* case, as compared with that before us. Dezort did not act negligently, he acted deliberately. The question was as to whether his state of drunkenness was contributory negligence as a matter of law. This court, in reversing the trial court, implied that he was not guilty of contributory negligence because his mental state precluded responsibility for his own safety. But, the plaintiff

in our case, however, testified she understood the rule about supervised smoking and there is no reason to dispense her from responsibility for her own recklessness. Thus, we feel the *Dezort* case is not apposite to the case now before us and the plaintiff in the instant case was not free from contributory negligence.

The judgment of the circuit court of Lake County directing a judgment in favor of the defendant is affirmed.

Judgment affirmed.

NASH and WOODWARD, JJ., concur.