MARY CORLETT, Special Adm'r of the Estate of Arthur W. Corlett, Jr., Deceased, Plaintiff-Appellant, v. JOHN A. CASERTA, Defendant-Appellee.

First District (4th Division)   No. 1—89—0566

Opinion filed September 28, 1990.—Rehearing denied October 30, 1990.

404

406

JIGANTI, J., specially concurring.

Stuart W. Opdycke, of Rosenberg, Opdycke, Gildea, Hellner & Kelly, of Chicago ( Steven J. Rosenberg, of counsel), for appellant.

French, Rogers, Kezelis & Kominiarek, P.C., of Chicago (Dorothy F. French, Russell P. Veldenz, and Michael R. Webber, of counsel), for appellee.

PRESIDING JUSTICE McMORROW delivered the opinion of the court:

Plaintiff Mary Corlett (plaintiff), as special administrator of the estate of her late husband, Arthur W. Corlett, Jr. (Corlett) (hereinafter collectively referred to as the Corletts), filed a wrongful death suit against defendant Dr. John A. Caserta (Caserta). Plaintiff alleged that Caserta's negligence in failing to make an earlier diagnosis of Cor-

lett's development of gastric bleeding following colon surgery proximately caused Corlett's death. Caserta filed a motion for summary judgment, arguing that Corlett's refusal of a blood transfusion, suggested by Caserta upon the discovery of Corlett's gastric bleeding, barred plaintiff's wrongful death suit as a matter of law. Caserta also argued that a release signed by the Corletts, which relieved Caserta of liability for respecting their refusal to have a blood transfusion administered to Corlett, justified the entry of summary judgment in his favor.

■■ We conclude that the release signed by the Corletts did not relieve Caserta of liability for Corlett's wrongful death resulting from Caserta's alleged negligence. We also determine that Corlett's refusal of the blood transfusion is an element which may be considered by the fact finder in deciding issues of proximate cause and comparative fault, and that these questions cannot be resolved as a matter of law in the instant appeal. Accordingly, we reverse the trial court's judgment and remand the matter for further proceedings.

The following facts are presented by the pleadings and the discovery materials filed by the parties with respect to Caserta's summary judgment motion. On July 5, 1978, Caserta performed surgery to remove polyps from Corlett's colon. Corlett informed Caserta prior to the operation that no blood should be administered to him during the surgery, because Corlett was one of Jehovah's Witnesses, whose religious convictions forbid the acceptance of a blood transfusion. On the consent to surgery form provided to him prior to the operation, Corlett again indicated in his own handwriting that he did not consent to the administration of blood during the surgery. Plaintiff, also one of Jehovah's Witnesses, concurred in Corlett's instruction that no blood be administered during the surgery. There were no complications during the course of the colon operation.

Three days after the surgery, on July 8, 1978, Corlett developed a fever because of an infection resulting from the surgery. Caserta prescribed aspirin to reduce Corlett's elevated temperature and directed that the aspirin be administered every four hours whenever Corlett's temperature exceeded 100 degrees Fahrenheit. Aspirin was administered by hospital personnel in accordance with Caserta's instructions. On July 16 and July 17, approximately a week after the administration of aspirin had begun, Corlett vomited a dark black liquid and had loose stools. Two days later, on July 19, Corlett's emesis was bright red. Because of this last development, a hospital staff physician directed that the administration of aspirin be discontinued and that Corlett be given a different drug used to stop gastric bleeding.

According to Caserta's deposition testimony, Caserta advised the Corletts on July 19 that a blood transfusion was imperative and was the only remaining treatment available to alleviate Corlett's internal bleeding. He also advised the Corletts that the failure to administer a blood transfusion would place Corlett's life in grave peril. Both Corlett and plaintiff refused the transfusion because of their religious convictions.

It appears from the record that the Corletts then signed a release document (hereinafter referred to as the release) containing the following language:

"I *** am a member of the religious [s]ect [sic] known as Jehovah's Witness and follow their tenets and beliefs, I refuse to allow anyone to give whole blood transfusion or blood derivatives. The risks attendant to my refusal have been fully explained to me, and I fully understand that I will in all probability need whole blood or blood derivatives and if the same is not done, my chances for regaining normal health are seriously reduced, and that, in all probability, my refusal for such treatment or procedure will seriously imperil my life.

I hereby release the Hospital, its nurses and employees, together with all physicians in any way connected with me as a patient, from liability for respecting and following my expressed wishes and direction."

Corlett died on July 21, 1978, of complications resulting from gastric bleeding caused by ulceration of his stomach lining. He was 55 years old.

In their depositions given during discovery, the medical experts retained by the parties agreed that Caserta's original prescription of aspirin was an acceptable treatment for Corlett's fever and infection, and that the fever and infection were normal complications of the colon surgery. However, it was the opinion of plaintiff's expert that Caserta should have ordered a test on July 16 or July 17, when Corlett vomitted dark liquid and had loose stools, which would have revealed that Corlett was suffering from gastric bleeding. Plaintiff's expert held the opinion that Caserta, upon making a diagnosis of gastric bleeding on July 16 or July 17, should have discontinued the administration of aspirin on that date, since the aspirin irritated the stomach lining and exacerbated the gastric bleeding. Thus, it was the opinion of the plaintiff's expert that the treatment given Corlett on July 19, i.e., the discontinuance of aspirin and the administration of a drug that inhibits gastric bleeding, should have begun two or three days earlier, on July 16 or July 17. Plaintiff's expert stated that, in his

opinion, if the proper procedure had been instituted on July 16 or July 17:

> "[I]n all medical probability, given the response of the patient from the 19th on to appropriate treatment with [a drug to inhibit gastric bleeding], stopping the aspirin, and antacids, that the patient probably would have survived; that the bleeding would have stopped, and that he would not have bled to a point where he went into irreversible shock and was not able to be resuscitated."

Plaintiff's expert also stated that if Corlett had been given a blood transfusion on either July 16, July 17, July 18, or July 19, "in all medical probability" Corlett would have survived, "[a]ssuming that the other measures taken [on July 19] were instituted as well, [i.e.,] *** the institution of [a drug to inhibit gastric bleeding], et cetera." Plaintiff's expert stated that "[e]ven as of July 19, the giving of blood to Mr. Corlett would have been lifesaving."

Defendant's medical expert stated at his deposition that Caserta's failure to diagnose Corlett's gastric bleeding before July 19 did not, in his opinion, fall below a minimum standard of acceptable medical care. It was the opinion of defendant's expert that Corlett's symptoms on July 16 and July 17 did not indicate the need for a test to determine the possible presence of gastric bleeding. Defendant's expert stated that he disagreed with the opinion of plaintiff's expert, quoted in the previous paragraph, since "[e]rosive gastritis is a condition that in and of itself is highly fatal [and is] usually associated with about a 25 percent mortality rate when all treatment is allowed, including blood transfusion." Defendant's expert acknowledged that "[t]he only chance [Corlett] had of surviving once the significant hemorrhage occurred was to have received a transfusion, plus whatever other therapy may have been indicated." He further noted that "the only other therapy that may have been indicated—at least the surgical therapy— would have been prevented by his refusal to accept a transfusion."

The trial court granted summary judgment in favor of Caserta, reasoning that Corlett's refusal of the blood transfusion suggested by Caserta on July 19 barred plaintiff's wrongful death suit. Plaintiff appeals.

## I

We first consider Caserta's argument that the release executed by the Corletts on July 19, that relieved Caserta from liability for their refusal to accept a blood transfusion, serves as a complete bar to plaintiff's wrongful death suit.

To support his position, Caserta relies upon *Harris v. Walker* (1988), 119 Ill. 2d 542, 519 N.E.2d 917. In *Harris,* the plaintiff filed suit to recover personal injuries sustained while plaintiff was riding a horse owned by defendant. The exculpatory clause at issue in *Harris* stated in pertinent part that plaintiff released defendant "of any liabilities [plaintiff] may incur while on the premises or for any injury which may result from horseback riding." (119 Ill. 2d at 549.) In view of the broad language utilized in the exculpatory clause in *Harris,* and the degree to which the plaintiff was an experienced horseback rider, the Illinois Supreme Court concluded that the release barred plaintiff's suit, even though the exculpatory clause did not anticipate the precise harm which the plaintiff had suffered.

The release at issue in the instant cause is distinctly different from that in *Harris.* Contrary to Caserta's argument on appeal, the release executed by the Corletts does not contain broad language that bars *any* claim for damages as a result of Corlett's death, for failure to have a blood transfusion. The release at issue here simply relieves Caserta "from liability for respecting and following [Corlett's] expressed wishes and direction" that Corlett not receive a blood transfusion. Thus, *Harris* is factually distinguishable from the case at bar.

■■ ■ The Illinois Supreme Court has directed that a release must state with particularity the parties' intention, and limits only those claims expressly covered by its terms. (*Scott & Fetzer Co. v. Montgomery Ward & Co.* (1986), 112 Ill. 2d 378, 395, 493 N.E.2d 1022.) The release at issue here bars plaintiff from instituting a wrongful death claim asserting that Caserta is liable for respecting Corlett's refusal of a blood transfusion. However, plaintiff's wrongful death suit is not predicated upon Caserta's respect for Corlett's refusal of a blood transfusion, nor is plaintiff's suit founded upon Caserta's failure to administer a blood transfusion to Corlett. Plaintiff's wrongful death suit is founded upon Caserta's alleged negligent failure to timely diagnose and treat Corlett's gastric bleeding following colon surgery. It is the theory of plaintiff's wrongful death action that, if Caserta had timely diagnosed and treated Corlett's gastric bleeding, Corlett's condition would not have deteriorated and a blood transfusion would have been unnecessary. Neither the consent to surgery form signed by Corlett prior to surgery, nor the release from liability executed by the Corletts upon their refusal to permit the administration of a blood transfusion, specifically relieved Caserta from liability for failure to properly diagnose and treat Corlett's gastric bleeding. Because the release signed by the Corletts does not explicitly govern Caserta's liability for an alleged negligent failure to timely

diagnose and treat Corlett's gastric bleeding, we conclude that the documents executed by the Corletts do not bar plaintiff's wrongful death suit against Caserta.

## II

We next consider Caserta's argument that because a blood transfusion would probably have averted Corlett's death, Corlett's refusal of a blood transfusion should preclude plaintiff's recovery in a wrongful death action as a matter of law. Caserta urges that a physician should be relieved of all wrongful death liability whenever the physician has respected the wishes of a conscious, competent adult patient who, upon the exercise of religious beliefs, voluntarily refused the only medical treatment available to the physician to save the patient's life.

A plaintiff in a medical malpractice action must plead and prove that the defendant physician owed a duty to the plaintiff to exercise a certain standard of care in the defendant's treatment of the plaintiff, that the defendant's treatment fell below this standard of care and proximately caused plaintiff to suffer injuries, and that these injuries entitled plaintiff to an award of monetary damages. (See, *e.g.,* *Ramos v. Pyati* (1989), 179 Ill. App. 3d 214, 534 N.E.2d 472.) However, a plaintiff has a duty to mitigate the damages resulting from a defendant's negligence. (See, *e.g.,* *Rozny v. Marnul* (1969), 43 Ill. 2d 54, 250 N.E.2d 656.) Based upon mitigation of damages principles, plaintiff's award of damages should be reduced to the extent that the injuries were caused by plaintiff's voluntary refusal of the reasonable medical treatment. (See, *e.g.,* *Newell v. Corres* (1984), 125 Ill. App. 3d 1087, 466 N.E.2d 1085; *Littlejohn v. Arbogast* (1900), 95 Ill. App. 605; *Haering v. Spicer* (1900), 92 Ill. App. 449; see also *Casey v. Baseden* (1986), 111 Ill. 2d 341, 490 N.E.2d 4; see generally Illinois Pattern Jury Instructions, Civil, No. 33.01 (3d ed. 1989) (hereinafter IPI Civil 3d).) Recent decisions have also analyzed a plaintiff's failure to follow reasonable medical advice in the context of comparative negligence principles. (See, *e.g.,* *Witherell v. Weimer* (1987), 118 Ill. 2d 321, 515 N.E.2d 68; *Bartimus v. Paxton Community Hospital* (1983), 120 Ill. App. 3d 1060, 458 N.E.2d 1072; see also *Graze v. Lawless* (1979), 71 Ill. App. 3d 669, 389 N.E.2d 957; *Seymour v. Victory Memorial Hospital* (1978), 60 Ill. App. 3d 366, 376 N.E.2d 754 (analyzing facts under concept of plaintiff's contributory negligence).) Similarly, under principles of assumption of the risk, a plaintiff's award is offset by the degree to which the plaintiff assumed the risks of defendant's negligence, in that plaintiff knew of these risks and nevertheless vol-

untarily and unreasonably proceeded to encounter them. See, *e.g., Varilek v. Mitchell Engineering Co.* (1990), 200 Ill. App. 3d 649; *Wheeler v. Roselawn Memory Gardens* (1989), 188 Ill. App. 3d 193, 543 N.E.2d 1328; *Duffy v. Midlothian Country Club* (1985), 135 Ill. App. 3d 429, 481 N.E.2d 1037; see generally IPI Civil 3d, chapter 13 (assumption of risk).

This precedent does not support Caserta's proposed *per se* rule that the estate of a deceased patient who refused, on religious grounds, a reasonable lifesaving medical treatment should be barred, as a matter of law, from all wrongful death recovery from the physician whose negligence necessitated the lifesaving medical procedure. Whether based upon principles relating to mitigation of damages, comparative fault, or assumption of the risk, we do not believe that a patient's refusal to accept a reasonable medical treatment, suggested in an effort to alleviate the consequences of the physician's negligence, should serve to completely defeat the patient's recovery for those injuries proximately caused by the physician's negligent acts. Nor do we believe Illinois tort rules regarding mitigation of damages, comparative fault, or assumption of risk dictate the conclusion that a patient who, for religious reasons, refused medical treatment necessitated by a physician's negligence should be denied compensation for those injuries attributable to the physician's tortious conduct.

However, we believe that a physician who commits a tortious act should not be totally liable for all subsequent injuries to the patient when the patient's injuries are attributable, in part, to the patient's refusal of a proposed reasonable medical treatment. We decline to create, for a patient who refuses a reasonable lifesaving medical treatment because of the patient's religious convictions, an exemption from tort principles governing mitigation of damages, comparative fault, and assumption of the risk.

Plaintiff emphasizes that Corlett had a constitutional right to refuse the suggested blood transfusion because of his religious beliefs. A patient's fundamental right to refuse lifesaving medical treatment derives from both the United States Constitution and the Illinois common law. (*Cruzan v. Director, Missouri Department of Health* (1990), 497 U.S. ____, 111 L. Ed. 2d 224, 110 S. Ct. 2841; *In re Estate of Greenspan* (1990), 137 Ill. 2d 1; *In re Estate of Longeway* (1989), 133 Ill. 2d 33, 549 N.E.2d 292; *In re E.G.* (1989), 133 Ill. 2d 98, 549 N.E.2d 322; *In re Estate of Brooks* (1965), 32 Ill. 2d 361, 205 N.E.2d 435.) Nevertheless, there is a marked distinction between a patient's exercise of his fundamental and religious rights to refuse a lifesaving medical treatment and a patient's attempt to impose the consequences

of his religious decisions upon a physician who has committed a tort against him. The freedom to act upon one's religious convictions does not encompass the privilege of imposing tort liability on another for injuries resulting, not from another's tortious conduct, but rather from the voluntary practice of one's religious convictions. See *Munn v. Algee* (N.D. Miss. 1990), 730 F. Supp. 21, modifying *Munn v. Southern Health Plan, Inc.* (N.D. Miss. 1989), 719 F. Supp. 525; *Shorter v. Drury* (1985), 103 Wash. 2d 645, 695 P.2d 116; *Christiansen v. Hollings* (1941), 44 Cal. App. 2d 332, 112 P.2d 723; *Lange v. Hoyt* (1932), 114 Conn. 590, 159 A. 575; see also *Walter Nashert & Sons v. McCann* (Okla. 1969), 460 P.2d 941 (worker's compensation); *Industrial Comm'n v. Vigil* (1962), 150 Colo. 356, 373 P.2d 308 (worker's compensation); *Martin v. Industrial Accident Comm'n* (1956), 147 Cal. App. 2d 137, 304 P.2d 828 (worker's compensation), disapproved in *Montgomery v. Board of Retirement* (1973), 33 Cal. App. 3d 447, 109 Cal. Rptr. 181 (disability retirement).

Allocation of proportionate liability to a patient for the consequences of the patient's exercise of his religious convictions does not, in our opinion, violate the patient's religious or fundamental rights. The prerogative to exercise one's religious beliefs does not permit a person, "by virtue of his beliefs, 'to become a law unto himself,' [citation]," and to hold otherwise would "contradict[ ] both constitutional tradition and common sense." (*Employment Division, Department of Human Resources v. Smith* (1990), 494 U.S. 872, 885, 108 L. Ed. 2d 876, 890, 110 S. Ct. 1595, 1603.) In addition, there is a strong public policy in Illinois to preserve the sanctity of human life. (See *Longeway*, 133 Ill. 2d at 51; *Siemieniec v. Lutheran General Hospital* (1987), 117 Ill. 2d 230, 250, 512 N.E.2d 691.) Courts have endeavored to balance the interests of both physician and patient so that the medical profession maintains this public policy in favor of sustaining life, yet respects the wishes of a competent, adult patient to refuse a reasonable, lifesaving medical treatment. *Longeway*, 133 Ill. 2d at 51.

Based upon these considerations, we conclude that, when a physician's negligent act causes a patient to suffer life-threatening injuries, and the patient exercises his fundamental and religious right to refuse a reasonable lifesaving medical procedure and subsequently dies, the patient's estate must bear a proportionate share of tort liability for the patient's wrongful death, to the extent that the patient's death was proximately caused by the patient's refusal of the reasonable lifesaving treatment. See *Munn v. Algee* (N.D. Miss. 1990), 730 F. Supp. 21, modifying *Munn v. Southern Health Plan, Inc.* (N.D. Miss.

1989), 719 F. Supp. 525; *Shorter v. Drury* (1985), 103 Wash. 2d 645, 695 P.2d 116; *Christiansen v. Hollings* (1941), 44 Cal. App. 2d 332, 112 P.2d 723; *Lange v. Hoyt* (1932), 114 Conn. 590, 159 A. 575.

■■■ ■ We note that, as a general rule, the question of whether a plaintiff's refusal of a proposed medical procedure was reasonable depends on factors such as the gravity of plaintiff's original injury, the intrusiveness of the proposed medical procedure and its attendant risk of complications, the feasibility of alternative medical procedures, the expense of the proposed medical treatment, the likelihood of increased recovery if the proposed medical procedure had been accepted by the plaintiff, and other relevant circumstances. (See, *e.g., Lapidus v. Hahn* (1983), 115 Ill. App. 3d 795, 450 N.E.2d 824; *Rosenstein v. Chicago Transit Authority* (1973), 12 Ill. App. 3d 1089, 299 N.E.2d 396; *Howard v. Gulf, Mobile & Ohio R.R. Co.* (1957), 13 Ill. App. 2d 482, 142 N.E.2d 825; *Morris v. Despain* (1902), 104 Ill. App. 452.) Based upon these factors, Illinois courts have generally held that a patient has a duty to accept a reasonable medical treatment, but has no obligation to undergo a serious operation, in order to mitigate damages. See, *e.g., Montgomery v. Terminal R.R. Association* (1979), 73 Ill. App. 3d 650, 392 N.E.2d 77 (evidence regarding plaintiff's refusal of serious operation on religious grounds properly excluded, as plaintiff had no obligation to undergo surgery in order to mitigate damages of defendant's negligence); *Littlejohn v. Arbogast* (1900), 95 Ill. App. 605; see generally IPI Civil 3d No. 33.01.

Where a patient has refused a medical treatment because of religious beliefs, courts from other jurisdictions have held that the patient's religious convictions are relevant in determining the reasonableness of the patient's refusal of the procedure. (See *Shorter v. Drury* (1985), 103 Wash. 2d 645, 695 P.2d 116; *Walter Nashert & Sons v. McCann* (Okla. 1969), 460 P.2d 941; *Industrial Comm'n v. Vigil* (1962), 150 Colo. 356, 373 P.2d 308; *Martin v. Industrial Accident Comm'n* (1956), 147 Cal. App. 2d 137, 304 P.2d 828; *Christiansen v. Hollings* (1941), 44 Cal. App. 2d 332, 112 P.2d 723; *Lange v. Hoyt* (1932), 114 Conn. 590, 159 A. 575.) It has been noted in legal commentary that the admission of such evidence may put in issue the reasonableness of a person's exercise of his religious convictions, and may also place at issue the validity of the religious belief or doctrine, in contravention of first amendment proscriptions. (See Comment, *Medical Care, Freedom of Religion, & Mitigation of Damages*, 87 Yale L.J. 1466 (1978), see also *Munn v. Southern Health Plan, Inc.* (N.D. Miss. 1989), 719 F. Supp. 525, *modified on other grounds Munn v. Algee* (N.D. Miss. 1990), 730 F. Supp. 21.) However, the admissibil-

ity of such evidence is not before us on review of the trial court's allowance of Caserta's motion for summary judgment.

Turning to the propriety of the trial court's entry of summary judgment in favor of Caserta, the Illinois Code of Civil Procedure provides that summary judgment is appropriate where the pleadings and depositions show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. (Ill. Rev. Stat. 1989, ch. 110, par. 2—1005(c).) In determining the existence of a genuine issue of material fact, courts must consider the pleadings, depositions, admissions, exhibits, and affidavits on file in the case and must construe them strictly against the movant and liberally in favor of the opponent. (*Purtill v. Hess* (1986), 111 Ill. 2d 229, 240, 489 N.E.2d 867.) Issues of proximate cause, comparative fault, assumption of the risk, and mitigation of damages are generally matters to be determined by the trier of fact, and summary judgment on these questions is appropriate only where reasonable minds would agree that the facts and their reasonable inferences demonstrate that the moving party is entitled to judgment as a matter of law. See, *e.g., King v. Petefish* (1989), 185 Ill. App. 3d 630, 541 N.E.2d 847.

Applying these principles to the case at bar, the evidence of record, when viewed in the light most favorable to the plaintiff, reveals genuine issues of material fact that preclude the entry of summary judgment. The depositions of the parties' experts reveal a factual dispute with respect to whether Caserta's treatment of Corlett was negligent. Their deposition testimony is also conflicting with regard to whether it was medically probable that Corlett would have survived if he had accepted the blood transfusion. In addition, there is no evidence in the record regarding all of the various factors pertaining to the reasonableness of the blood transfusion suggested to Corlett. Lastly, although the Corletts may have assumed the risk of Corlett's death as a consequence of their refusal to permit the blood transfusion, it is for a fact finder to determine what percentage of the total damage award should be attributed to Corlett's refusal of the blood transfusion.

We conclude that when a physician's negligent act causes a patient to suffer life-threatening injuries, and the patient exercises his fundamental and religious right to refuse a reasonable lifesaving medical procedure and subsequently dies, the patient's estate should bear a proportionate share of tort liability for the patient's wrongful death to the extent that the patient's death was proximately caused by the patient's refusal of the reasonable lifesaving treatment. On this rec-

ord, we cannot say as a matter of law that Corlett's refusal of a blood transfusion was the sole proximate cause of his death, or that Corlett's refusal of a blood transfusion should, based upon principles of comparative fault, assumption of the risk, or mitigation of damages, relieve Caserta of all liability for Corlett's death. In our view, these questions are ones over which reasonable minds could differ and require a trial for their ultimate resolution.

For these reasons, we reverse the trial court's judgment and remand the matter for further proceedings.

Reversed and remanded.

LINN, J., concurs.

JUSTICE JIGANTI, specially concurring:

In moving for summary judgment, the defendant argued that there is no material issue of fact because it is undisputed that the plaintiff would not have accepted a blood transfusion under any circumstances. The defendant based his argument on the Corletts' refusal of a blood transfusion and a release they signed to that effect. The Corletts signed the release after the alleged negligence of the doctor occurred. For purposes of our review, we must accept that the defendant was negligent. *Purtill v. Hess* (1986), 111 Ill. 2d 229, 489 N.E.2d 867.

Illinois common law imposes a duty on the plaintiff not to refuse reasonable medical treatment. (*Haering v. Spicer* (1900), 92 Ill. App. 449; Illinois Pattern Jury Instructions, Civil, No. 105.08 (1961) (a patient is required to follow reasonable advice of physician); also see *Newell v. Corres* (1984), 125 Ill. App. 3d 1087, 466 N.E.2d 1085 (under comparative negligence principles, a patient's refusal to accept treatment is a factor to be weighed in determining the relative degree of negligence of the parties).) In determining the reasonableness of the medical treatment, the finder of fact must consider, among other factors, the degree of risk, the amount of pain, the degree of relief hoped for, and the chances of success of the disputed treatment. (D. Dobbs, Handbook on the Law of Remedies §8.9 (1973).) In the present case, the only evidence presented concerns the plaintiff's subscription to the beliefs of the Jehovah's Witness religion. As such, we cannot determine if Corlett's refusal of a blood transfusion was reasonable and the trial court's summary judgment order must be reversed.

However, in remanding this case, I believe we must offer some guidance to the trial court so that it may squarely address the effect

of Corlett's religious beliefs on his duty to accept reasonable medical treatment. With respect to this issue, I believe that if a blood transfusion is otherwise considered reasonable, this determination is not changed by the fact that a patient refuses the transfusion because he is a Jehovah's Witness. Once a patient avails himself of medical treatment generally, he accepts that his treatment will involve reasonable medical procedures. The plaintiff is not precluded from exercising his right to refuse medical treatment for religious reasons; however, he cannot impose a greater liability on the defendant than would have obtained had his religious beliefs permitted him to undergo the treatment. *Martin v. Industrial Accident Comm'n* (1956), 147 Cal. App. 2d 137, 304 P.2d 828 (upholding finding of Industrial Commission that worker who refused lifesaving blood transfusion because he was a Jehovah's Witness had unreasonably refused medical treatment and was therefore not entitled to worker's compensation), *disapproved in Montgomery v. Board of Retirement* (1973), 33 Cal. App. 3d 447, 109 Cal. Rptr. 181.

Whether a patient's refusal to accept medical treatment is reasonable depends on factors relating to the risk, effort, sacrifice, and expense involved. (*Cockrum v. Baumgartner* (1981), 99 Ill. App. 3d 271, 425 N.E.2d 968, *reversed on other grounds* (1983), 95 Ill. 2d 193, 447 N.E.2d 385, *cert. denied* (1983), *Raja v. Michael Reese Hospital*, 464 U.S. 846, 78 L. Ed. 2d 139, 104 S. Ct. 149.) A patient's religious convictions do not affect the determination of what is reasonable. When a patient refuses an otherwise unreasonable treatment, it is of no consequence that he has based his refusal on religious grounds. (See *Montgomery v. Terminal R.R. Association* (1979), 73 Ill. App. 3d 650, 392 N.E.2d 77.) Similarly, when a patient refuses an otherwise reasonable treatment, his duty to accept that treatment is not qualified by the fact that his refusal is dictated by his religious beliefs.

As to the release signed by the Corletts, I am in agreement with Judge Joseph Gordon, the original trial judge. Judge Gordon correctly ruled that a release signed after the defendant's negligence took place cannot serve to retroactively relieve the defendant's liability.

Because the majority opinion is precedential, I feel that I must make certain comments about it. It appears to me that the question of religion is clearly raised in the briefs and certainly the majority comments on it. However, the majority refuses to rule on the religious question, stating that the admissibility of evidence of religious beliefs is not before the court on review. This stance is rather puzzling in light of the fact that the majority spends a considerable amount of time musing about the religious issue and then appears to rule on the

issue specifically. The opinion states that the majority declines to create "an exemption from tort principles" where a patient refuses treatment because of religious convictions. (204 Ill. App. 3d at 412.) In an apparent retreat from that proposition, the majority states that where a party refuses reasonable medical treatment on religious grounds, the refusal should not "completely defeat" the patient's recovery, and further that the doctor should not be "totally liable" for all subsequent injuries. (204 Ill. App. 3d at 412.) The majority concludes the issue by stating that where the doctor is negligent and the patient exercises his religious right to refuse reasonable medical procedures, the patient's estate must bear a proportionate share of the tort liability to the extent that the death was proximately caused by the patient's refusal.

The majority's messages to the trial court on remand are confusing and mixed. I am concerned about the statements of the court that I have related to the extent that they say that in all situations where a doctor is negligent, an injured patient must recover, albeit on a reduced basis. There may well be situations, the present one included, in which the doctor's conduct may be denominated as malpractice but no injury would follow if the plaintiff had accepted reasonable treatment.