James **CROWLEY**, Plaintiff,

v.

The **UNITED STATES of America**, Defendant.

**No. 90 C 0402.**

United States District Court, N.D. Illinois, E.D.

Aug. 15, 1991.

---

Brian J. Diamond, Thomas L. Knight, Walsh, Knippen, Knight & Diamond, Chartered, Wheaton, Ill., for plaintiff.

Fred Foreman, U.S. Atty. by Linda A. Wawzensky, Asst. U.S. Atty., Chicago, Ill., for defendant.

## ORDER

BUA, District Judge.

On January 24, 1990, plaintiff James Crowley filed this suit against the United States of America pursuant to 28 U.S.C. § 1346(b). Crowley claims that physicians practicing at a Veterans Administration Hospital deviated from the applicable standard of care when treating him. A bench trial on his claims took place January 14–16, 1991. Based on the evidence presented at trial, the court makes the following findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

## FINDINGS OF FACT

1. Plaintiff James Crowley is a forty-five year old man with a history of knee problems. (Transcript ("Tr.") at 6, 15–16.)

2. In 1978, Crowley began to have difficulties with his left knee. (Tr. at 16.) He sought treatment from Dr. Chand, an orthopedic surgeon, who recommended a regimen of x-rays and therapy. (Tr. at 16.) This treatment proved unsuccessful. Arthroscopic surgery was then done to repair cartilage in the knee. (Tr. at 16.) When Crowley still did not experience relief, Dr.

Chand performed a patellectomy. (Tr. 16–17.) After this treatment, pain did not reoccur in Crowley's left knee until 1987. (Tr. at 19.)

3. Crowley first faced difficulty with his right knee in 1973. (Tr. at 15.) X-rays and therapy resolved the problem until 1984, when he again consulted Dr. Chand. (Tr. at 15, 17.) Dr. Chand tried therapy and x-rays, but to no avail. (Tr. at 17–18.) In 1985, Dr. Chand performed a patellectomy on Crowley's right knee. (Tr. at 18.) Even after this surgery, Crowley was still experiencing pain in that knee. (Tr. at 18.)

4. In January 1987, Crowley sought treatment at the Lakeside Veterans Administration Hospital ("Lakeside") located in Chicago, Illinois. He visited Lakeside complaining of pain in both knees. (Tr. at 19.) He told doctors that all activity hurt his knees. (Government's Joint Exhibits A and B ("Exh. AB") at 2–272.) On January 23, 1987, Dr. Mehlhoff, an orthopedic surgeon, examined Crowley. (Tr. at 22.) Dr. Mehlhoff's notes indicate that Crowley had chronic aching pain at the level of the patellofemoral joint. The doctor documented pain in both the left and right knees. However, it appeared that there was less pain and crepitation (rubbing) in the left knee than the right knee. (Exh. AB at 2–278.) No joint line tenderness was found. Crowley was given an injection in his right knee along with medication to try to ease the pain. (Exh. AB at 2–278.) Crowley found the injection to be of "little help." And, because the medication produced side effects, Crowley refused to continue with it. (Exh. AB at 2–277.)

5. Crowley then made an appointment with Dr. Nasim A. Rana, the chief of orthopedic surgery at Lakeside. On May 15, 1987, Dr. Rana examined Crowley and recommended that surgery not be done at that time. Dr. Rana referred Crowley to Dr. James A. Hill. (Exh. AB at 2–275.) On June 1, 1987, Dr. Hill examined Crowley. He found that Crowley was experiencing pain in the anterior aspect of the knee. (Plaintiff's Exhibit K ("Exh. K") at 21.) Dr. Hill recommended that Crowley undergo a Maquet procedure on the right knee

since it was the "worst" knee. (Exh. K at 21.) At the time of his recommendation, Dr. Hill discussed with Crowley the possible risks and complications of the Maquet procedure. (Exh. K at 23.) A surgery date was set but subsequently cancelled because of a scheduling conflict. (Tr. at 32.)

6. In July of 1987, Crowley saw Dr. Karzel in the orthopedic clinic. (Tr. at 32–33, 149.) Dr. Karzel examined both of Crowley's knees. He noted that Crowley was experiencing tenderness over the patellar tendon (tendon of the kneecap). The medial or lateral compartments of the knee, though, were not tender. Because Crowley was in pain when his knees were flexed and extended, Dr. Karzel recommended against the Maquet procedure. (Tr. at 101–102). Crowley protested that Dr. Hill had already recommended the procedure. (Tr. at 34.) After consulting with Dr. Hill, Dr. Karzel scheduled Maquet surgery for Crowley's right knee. (Tr. at 103–104.)

7. On August 3, 1987, Crowley was admitted to Lakeside. Both his knees were again examined. He was diagnosed as having patellofemoral arthritis in the right knee. (Exh. AB at 3–44.) The Maquet procedure along with its risks, complications and alternatives were discussed with Crowley on August 5, 1987. (Exh. AB at 3–77.) On August 6, 1987, a Maquet osteotomy was performed on Crowley's right knee. (Exh. AB at 3–74.) The procedure consisted of bringing forward the tibial tubercle (shin bone) one and one-half centimeters by inserting a one inch piece of bone, taken from a different site, underneath it. The purpose of elevating the tibial tubercle in this case was to reduce pressure on the tendon. (Tr. at 312.)

8. Crowley's leg was put in a cast following surgery. (Exh. AB at 3–73.) Four days after surgery, the cast was changed. (Exh. AB at 3–68.) At that time, redness near the wound was noticed and antibiotics were prescribed. (Exh. AB at 3–68; Tr. at 116.) A few days later a window was put in the cast to allow Crowley to practice daily wound care. (Exh. AB at 3–64; Tr. at

167.) Crowley was discharged on August 14, 1987. (Exh. AB at 3–64.) After his discharge, Crowley continued with follow-up visits to the orthopedic clinic. (Exh. AB at 2–288, 2–289.)

9. After the right knee surgery, Crowley still complained of significant pain and limitation in his left knee. (Exh. AB at 2–287.) On November 30, 1987, he was admitted to Lakeside for a Maquet procedure on his left knee. (Exh. AB at 3–134.) He was again examined by physicians at Lakeside. (Exh. AB at 3–133, 3–134.) On December 1, 1987, Dr. Bielski took a history of Crowley's left knee. (Plaintiff's Exhibit L ("Exh. L")) at 66–67.) The preoperative diagnosis was patellar femoral arthritis. (Exh. AB at 3–134.) The Maquet surgery on Crowley's left knee was performed by Drs. Karzel and Bielski on December 2, 1987. (Exh. AB at 3–123.)

10. Crowley's leg was placed in a temporary cast following surgery. (Tr. at 121.) Two days after surgery, the cast was changed. (Tr. at 121.) At that time, Dr. Karzel noted that the wound was "clean and dry." (Exh. AB at 3–117.) Crowley was then put in a permanent cast. (Tr. at 121.) He was discharged from Lakeside on December 7, 1987. (Exh. AB at 3–115.)

11. Crowley returned to the clinic on December 18, 1987. His cast was removed and deep necrosis of the skin was observed at the wound site. (Exh. AB at 3–135.) (Necrosis is dead skin produced when blood supplying oxygen is cut off. (Tr. at 366.)) Crowley was readmitted to Lakeside. (Exh. AB at 2–42.) He underwent surgery on December 21, 1987 to debride and close the wound. Toward that end, a lateral relaxing incision was attempted, (Exh. AB at 2–134), but it proved unsuccessful. (Exh. AB at 2–124.)

12. On December 24, 1987, Crowley was transferred to Hines Veterans Administration Hospital ("Hines"). (Exh. AB at 2–124.) He underwent a second surgery to debride and close the wound on December 29, 1987. (Exh. AB at 2–116.) However, a portion of the wound remained exposed. Crowley underwent further surgery on February 9, 1988. (Exh. AB at 2–181.) Crowley was discharged from Hines on March 1, 1988. (Exh. AB at 2–171.)

13. On September 15, 1988, Crowley saw Dr. S. J. Yelich at the Lakeside pain clinic. Crowley complained of pain centered around the left knee joint, medial leg and the ankle. Although he was able to walk, his left leg was stiff. (Exh. AB at 2–315.) Saphenous nerve blocks were administered to the left leg on September 23, September 30 and October 7, 1988 to combat the pain. (Exh. AB at 2–321, 2–325, 2–335.) A sympathetic chain block was mentioned, but Crowley objected to that treatment. (Exh. AB at 2–334.) As a check for infection, Crowley underwent a bone scan, gallium scan, indium scan and MRI. (Exh. AB at 1–369 to 1–373.) These tests turned up negative. (Exh. AB at 1–369 to 1–373.)

14. Still seeking treatment, Crowley revisited Dr. Chand. (Tr. at 70.) Dr. Chand performed arthroscopic surgery on Crowley's left knee on August 14, 1989, with little result. (Tr. at 71.) Crowley remains in pain. (Tr. at 72.)

15. To the extent that any of the foregoing findings of fact are deemed to be conclusions of law, they are hereby adopted as conclusions of law.

## CONCLUSIONS OF LAW

### I. Jurisdiction

1. Under 28 U.S.C. § 1346(b), a district court has exclusive jurisdiction over civil actions brought against the United States in which a plaintiff seeks money damages for personal injury caused by the negligent or wrongful acts or omission of any employee of the government who was acting within the scope of his office or employment.

2. Dr. Ronald P. Karzel and Dr. Robert G. Bielski were employed by the United States as treating physicians in a Veterans Administration Hospital ("VA Hospital") and acting within the scope of their employment when they diagnosed and treated Crowley. (Government's Answer at 1.)

3. Therefore, the court concludes that it has jurisdiction over this matter.

## II. Claims

4. To establish negligence on the part of the physicians, Crowley must demonstrate the proper standard of care against which the defendant physicians' conduct should be measured; an unskilled or negligent deviation from that standard of care; and an injury proximately caused by the physicians' lack of skill or care. *Purtill v. Hess*, 111 Ill.2d 229, 95 Ill.Dec. 305, 310, 489 N.E.2d 867, 872 (1986); *Borowski v. Von Solbrig*, 60 Ill.2d 418, 328 N.E.2d 301, 304–305 (1975).

5. The appropriate standard of care is "that degree of knowledge, skill, and care which a reasonably well-qualified physician in the same or a similar community would bring to a similar case under similar circumstances." *Purtill*, 95 Ill.Dec. at 310, 489 N.E.2d at 872.

6. Generally, the elements of a negligence claim must be proved by expert testimony. *Ramos v. Pyati*, 179 Ill.App.3d 214, 128 Ill.Dec. 290, 293, 534 N.E.2d 472, 475 (1989). With respect to the standard of care, an expert may testify to minimum standards of care which are uniform throughout the country. *Purtill*, 95 Ill. Dec. at 314, 489 N.E.2d at 876.

7. In this case, Crowley set forth various reasons why the VA Hospital doctors failed to meet the standard of care in the diagnosis and treatment of his left knee. In support of his allegations, Crowley offered the testimony of Dr. Ronald B. Greene. The court will treat each of these reasons in turn.

### A. Failure to Properly Examine and Diagnose

8. First, Crowley alleges that the doctors failed to properly examine his left leg and conduct the tests necessary to diagnose and treat his condition. The court finds to the contrary. The record is replete with references to physicians examining Crowley's left knee. (Tr. at 23, 101–102; Exh. AB at 3–133, 3–134, 2–272, 2–274, 2–278, 2–282; Exh. K at 21–23; Exh. L at 62, 66–67, 99.) Certain of these examinations were even conducted after the Maquet surgery on Crowley's right knee. (Exh. AB at 2–278, 3–133, 3–134; Exh. L at 66–67, 102.)

9. Crowley also makes the related claim that the Maquet osteotomy was the wrong procedure for treating the pain in his left knee. Crowley's expert, Dr. Greene, advanced the opinion that Crowley suffered pain from a medial compartment problem, a condition which could not be remedied by a Maquet procedure. (Plaintiff's Exhibit N–1 ("Exh. N–1") at 29–31, 72.) In support of his opinion, Greene pointed to Crowley's medical history and the deterioration Dr. Chand found in Crowley's knee. (Exh. N–1 at 72.) The court is not convinced. The historical note to which Greene probably referred, an x-ray notation highlighting a minimal narrowing of the medial knee joint space, was made by a radiologist. (Exh. AB at 2–274.) It was inconclusive. As for Dr. Chand's findings, they were incomplete. He did not do an arthroscopy of the entire knee. (Tr. at 310.) Moreover, Dr. Greene cast doubt on his own opinion by trying to parlay the fact that the left Maquet procedure did not alleviate Crowley's pain into a "confirmation" of his conclusion that the procedure should not have been done. (Exh. N–1 at 31.)

10. Dr. Greene's opinion as to the appropriateness of the Maquet must also be weighed against the opinions of the government's expert, Dr. Reider, and the treating physicians. Both Dr. Bielski and Dr. Karzel testified that they performed physical examinations of Crowley's knees. (Exh. L at 66–67; Tr. at 33, 101.) Dr. Bielski indicated that x-rays were even taken of the left knee. (Exh. L at 99.) Both doctors found that Crowley was experiencing pain in the patellofemoral joint area. (Exh. L at 102–103; Tr. at 101.) They both recalled that Crowley's pain made it difficult to climb stairs. (Exh. L at 103; Tr. at 107.) And, neither found that Crowley was experiencing any joint line tenderness, which is usually an indication of a medial joint line problem. (Tr. at 101, 307–308; Exh. AB at 2–278.) Both Drs. Reider and Karzel testified that these findings were more consistent with a diagnosis of pain related to the

residual patellar tendon. (Tr. at 176–177, 306.)

11. Crowley also makes some suggestion that, even assuming pain in the patellar femoral area, the doctors should have pursued a different course of treatment. He intimates that they should have avoided the Maquet procedure on the left knee and instead used less invasive methods of treatment. For example, Crowley claims that the doctors erred in not initially using anti-inflammatory injections, pain medications, and therapy on the left leg. The court is satisfied that these options were explored to the extent required by the applicable standard of care. Therapy had been attempted by Dr. Chand on both of Crowley's knees. In fact, Crowley had undergone patellectomies on both the left and right knees because therapy and other treatments had not succeeded. When Crowley was first seen at the orthopedic clinic, the doctors there attempted to treat him with anti-inflammatory drugs and pain medications. (Tr. at 105, 306.) Crowley found injections in his right knee to be of little help and he refused to continue with pain medications because of their side effects. (Exh. AB at 2–277, 2–278; Tr. at 24–25.) The alternative treatment road, then, was well trodden. Less invasive methods of treatment were not necessary.

### B. Failure to Take Appropriate Steps to Avoid Risk of Necrosis

■ Although necrosis was a significant risk in Crowley's case, the court cannot conclude that Dr. Greene's suggestions for reducing the risk of necrosis were required by the applicable standard of care. First, Dr. Greene maintained that the doctors should have consulted with more experienced physicians and/or a plastic surgeon before surgery. (Exh. N–1 at 24, 25.) According to the other testifying doctors, though, a plastic surgeon or other consulting physician is not normally contacted before Maquet surgery. (Tr. at 132–134, 318–319; Government's Exhibit 8 ("Exh. 8") at 48–49.) Dr. Greene next suggested that a tissue expander should have been used to relieve pressure on the site of the

Maquet. (Exh. N–1 at 27–28.) The other doctors also testified that they do not usually use this instrument with a Maquet procedure. (Tr. at 318, 373–374; Exh. J at 102.)) Dr. Reider even indicated that use of the tissue expander might increase the risk of necrosis. (Tr. at 318.)

Dr. Greene also discussed steps which might be taken at the time of surgery to reduce the risk of necrosis. It was Dr. Greene's opinion that the physicians performing the left Maquet did not properly evaluate the skin near the surgery site for signs of a proper blood supply. The court does not find that to be the case. The medical records provide ample proof that the site was examined. (Tr. at 337–338; Exh. AB at 3–134.) Greene further testified that lateral or medial relaxing incisions should have been made at the wound site. While the other testifying doctors agreed that these incisions could be made, most felt that the decision was best made at the time of surgery and should not be second-guessed. (Tr. at 198–202, 320; Exh. J at 99–101.) Dr. Karzel, in fact, thought that additional damage could have been done if more incisions were made. (Tr. at 202.)

### C. Failure to Properly Perform a Maquet Procedure

■ In addition, Crowley appears to suggest that the Maquet procedure itself was improperly performed on the left knee, thus deviating from the appropriate standard of care. The evidence in this case does not support that claim. Dr. Greene admitted that the bone elevation portion of the procedure was performed properly. (Exh. N–1 at 78.) And, in Dr. Reider's opinion, the operation was performed correctly. (Tr. at 311.) The doctors sought and achieved a one and one-half elevation of the tibial tubercle, they examined the skin after elevation for excess tension, put in drainage tubes, prescribed antibiotics, and protected and elevated the knee after surgery. (Tr. at 311–313.)

### D. Inappropriateness of Casting

■ Dr. Greene also opines that use of a cast after the procedure was a deviation

from the standard of care. (Exh. N–1 at 32.) Based on the testimony given by the other doctors, the court disagrees. Drs. Gordon W. Nuber and Nasim Rana testified that they always cast their patients after the Maquet procedure in order to provide maximum immobilization of the area. (Exh. 8 at 46; Exh. J at 155–156.) Dr. Reider, too, testified that some doctors cast patients after the Maquet procedure. (Tr. at 313.) Although Dr. Reider chooses to immobilize the area using internal fixation, it was his opinion that casting the area was well within the standard of care. (Tr. at 313–314, 341.)

■ Alternatively, Crowley claims that the standard, at the very least, required that a window be put in his cast. He points to the window cut into the cast on his right knee. However, the purpose behind windowing that cast was different. When changing the cast on Crowley's right knee, the doctors noticed some redness near the wound. The doctors feared that the redness was a sign of infection. (Tr. at 166; Exh. L at 166.) Therefore, they windowed the cast in order that Crowley might be able to observe the wound and perform wound care. (Tr. at 167.) In contrast, there were no signs of infection in the left knee. (Tr. at 320; Exh. J at 113.) Observation of the wound and wound care would not have altered the course of the necrosis that was occurring. (Tr. at 319–320; Exh. J at 114, 117.) It was Dr. Greene's view that the necrosis stemmed from the pressure exerted by the tibia on the skin and/or the incision. (Exh. N–1 at 35–36, 40–41.) Dr. Karzel also identified these elements as being behind Crowley's necrosis. (Tr. at 126.) The existence and scope of this type of necrosis, according to Dr. Reider, is set at the time of incision or elevation. (Tr. at 124, 319.) The only variable which could affect the scope of the necrosis was infection. No doctor found infection here. (Tr. at 126, 320; Exh. J at 110, 113; Exh. N–1 at 42.) Therefore, the court cannot find that a window in the cast was dictated by the applicable standard of care.

### E. Failure to Provide Proper Post-operative Care

■ In addition, Crowley claims that the physicians' postoperative treatment of his wound was lacking. Dr. Greene faulted the doctors for their failure to detect the necrosis earlier. (Exh. N–1 at 39–40.) Dr. Greene suggested that the doctors should have examined the wound multiple times a day over multiple days. (Exh. N–1 at 38.) The doctors did examine the wound two days after surgery. (Tr. at 121.) At that time, they did not see signs of necrosis or infection. Even if they should have followed the wound more closely, the court cannot find that the eleven-day lapse before discovery of the necrosis was the cause of Crowley's injury. Early detection would not have made any difference considering the type of necrosis that Dr. Greene identified as existing in this case. (Exh. N–1 at 35–36, 40–41.) Once the blood supply was disturbed, necrosis was bound to happen. The disturbance itself predetermined the amount of dead skin. (Tr. at 196, 319.) Since infection was not at issue, nothing could be done until the full extent of the disturbance became known. (Tr. at 319, 320; Exh. J at 117.) The doctors just had to wait out the necrosis until it became fully declared. (Tr. at 136, 319; Exh. J at 114, 119–120; Exh. K at 43–44; Exh. 8 at 46–47.) In the case of Crowley's left knee, that demarcation did not occur until several days *after* his necrosis was discovered by the doctors. (Tr. at 195–196.) Thus, the court cannot find a causal connection between the necrosis and Crowley's postoperative care.

### F. Other

The remaining allegations advanced by Crowley in the complaint were not supported by evidence at trial. There was no sign of infection in the left leg wound. (Exh. AB at 3–117; Tr. at 126, 320; Exh. J at 110, 113; Exh. N–1 at 42.) And, Crowley seems to have abandoned his claims involving use of a tourniquet. Crowley's expert, Dr. Greene, agreed that there was nothing negligent about the application or use of the tourniquet on Crowley's left leg during surgery. (Exh. N–1 at 80–81.) Cer-

tainly, then, these allegations could not constitute a deviation from the standard of care.

III. Conclusion

The plaintiff must bear the burden of proving by a preponderance of the evidence that a defendant deviated from the applicable standard of care. In this case, the court cannot find that Crowley upheld his burden and proved any of the claimed deviations from the applicable standard of care. Therefore, the court finds in favor of the defendant, the United States.

To the extent that any of the foregoing conclusions of law are deemed to be findings of fact, they are hereby adopted as findings of fact.

Judgment is entered in favor of the defendant, the United States.

IT IS SO ORDERED.